**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

K.M., individually and
as an intended third-party beneficiary
of applicable USA Water Polo,
SafeSport, and membership policies,

Plaintiff, Case No.:

vs. JURY TRIAL DEMANDED

UNITED STATES CENTER FOR
SAFESPORT, INC.; USA WATER POLO,
INC.; and SCOTT TRIPP,

Defendants.

---

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

**COMES NOW,** Plaintiff K.M., individually and as an intended third-party beneficiary of applicable USA Water Polo, SafeSport, and membership policies, by and through her undersigned counsel, and sues Defendants United States Center for SafeSport, Inc. (the "Center" or "SafeSport"), USA Water Polo, Inc. ("USA Water Polo"), and Scott Tripp, and alleges the following causes of action arising from SafeSport's unlawful conversion of K.M. from a claimant into a criminal suspect, its intentional withholding of exculpatory evidence, its malicious prosecution of K.M., and its ongoing publication of false and misleading disciplinary records:

## TABLE OF CONTENTS

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL** .................................. 1

**TABLE OF CONTENTS** .................................................................................. 2

**I. NATURE OF THE ACTION** ........................................................................ 4

**II. PARTIES** .................................................................................................. 7

**III. JURISDICTION AND VENUE** ................................................................. 9

**IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS** ........................... 13

A. K.M. Reports Bullying and Is Converted from Claimant into Suspect .................................................................................................... 13

B. The E.C. Matter and the First Criminal Case .................................. 18

C. The K.F. Matter and the Second Criminal Case .............................. 20

D. SafeSport's File, Withheld Materials, and the Criminal Proceedings .................................................................................................... 22

E. The Causal Chain from SafeSport's Conduct to K.M.'s Injuries .... 27

F. The SafeSport Arbitration and Sanctions ......................................... 31

G. The Expungement Proceedings and Supplemental Order ............ 36

**V. APPLICABLE ORGANIZATIONAL FRAMEWORK** ............................................ 42

**COUNT I - DECLARATORY JUDGMENT AND EQUITABLE RELIEF CONCERNING CONTRACTUAL AND MEMBERSHIP-BASED DUTIES** ......................................................................................... 48

**COUNT II - MALICIOUS PROSECUTION** ..................................................... 52

**COUNT III - BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** ............ 57

**COUNT IV - TORTIOUS INTERFERENCE WITH BUSINESS, ATHLETIC, AND ADVANTAGEOUS RELATIONSHIPS** .............................. 59

**COUNT V - TORTIOUS INTERFERENCE WITH BUSINESS, ATHLETIC, AND ADVANTAGEOUS RELATIONSHIPS** .............................. 61

**COUNT VII - DECLARATORY AND EQUITABLE RELIEF UNDER ARTICLE I, SECTIONS 9 AND 23 OF THE FLORIDA CONSTITUTION, AS APPLIED** .................................................... 67

**COUNT VIII - INJURIOUS FALSEHOOD / TRADE LIBEL / DISPARAGEMENT, AND, IN THE ALTERNATIVE, DEFAMATION BASED ONLY ON TIMELY PUBLICATIONS OR REPUBLICATIONS** ......................................................... 73

COUNT IX - DECLARATORY RELIEF CONCERNING PUBLICATION, DATABASE USE, AND CONTINUING EFFECT OF ALLEGATIONS .......... 83

COUNT X - ULTRA VIRES / EXCEEDING STATUTORY AUTHORITY, IN THE ALTERNATIVE .......... 87

COUNT XI - VIOLATION OF FEDERAL PROCEDURAL DUE PROCESS, IN THE ALTERNATIVE .......... 92

COUNT XII - PRIVATE NONDELEGATION / UNCONSTITUTIONAL DELEGATION OF GOVERNMENTAL POWER, IN THE ALTERNATIVE .......... 102

COUNT XIII - VIOLATION OF SHERMAN ACT § 1, 15 U.S.C. § 1, GROUP BOYCOTT AND, IN THE ALTERNATIVE, RULE-OF-REASON RESTRAINT OF TRADE .......... 111

COUNT XIV - VIOLATION OF SHERMAN ACT § 2, 15 U.S.C. § 2, MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION .......... 121

COUNT XV - VIOLATION OF SHERMAN ACT § 2, 15 U.S.C. § 2, CONSPIRACY TO MONOPOLIZE .......... 127

CONDITIONS PRECEDENT .......... 133

PRAYER FOR RELIEF .......... 136

JURY DEMAND .......... 141

## I. NATURE OF THE ACTION

1. This case arises from SafeSport's handling of a complaint made by K.M. ("K.M."), a water polo athlete who contacted SafeSport because she believed she was being bullied and targeted within her team environment. Rather than first interviewing K.M. or fairly testing her report, SafeSport's investigator reported her to Florida law enforcement as a suspect. That report helped move an internal team dispute into two criminal cases, a SafeSport disciplinary proceeding, and continuing athletic and reputational consequences.

2. This case does not challenge good faith reporting of abuse. It challenges what happened after SafeSport became involved: a premature law-enforcement referral, shifting allegations, incomplete disclosures, the intentional withholding of exculpatory evidence, and continued reliance on accusations that later testimony materially undermined.

3. This case also presents the accountability gap created when SafeSport uses federally recognized authority, national governing body enforcement, and law enforcement access to impose criminal, athletic, reputational, and eligibility consequences, while denying that it owes the procedural protections ordinarily associated with the exercise of such power.

4. The events began with team conflict at Seminole High School after an alleged January 30, 2022, incident involving high school water polo players. School officials promptly investigated. According to the materials presently available to

Plaintiff, the school investigation produced witness statements, involved school resource officers, and closed without further action or police involvement.

5. K.M. then reported bullying to SafeSport. SafeSport listed her as a claimant or reporter and advised that an investigator would be assigned. Before that investigator interviewed K.M., SafeSport investigator Scott Tripp contacted the Seminole County Sheriff's Office and reported K.M. as a suspect of a crime. On information and belief, Tripp represented or caused law enforcement to understand that E.C. had reported the matter to SafeSport, when the evidence shows that E.C. had not made such a report between January 30, 2022, and April 14, 2022. Law enforcement contacted E.C. only after Tripp's report.

6. SafeSport's report set in motion a criminal process that resulted in K.M. being arrested at school, forced to defend two misdemeanor battery cases, required to appear in court repeatedly for more than a year, and compelled to litigate to obtain the SafeSport file and related exculpatory information. The State ultimately entered nolle prosequi in both criminal cases.

7. The later SafeSport arbitration did not cure the harm. It compounded it. SafeSport issued a lengthy confidential investigation report, imposed disciplinary sanctions, and then relied on a private arbitration process in which the same core factual contradictions remained central. SafeSport is expected to rely on the arbitration decision. K.M. does not ignore it. She alleges that the decision was the product of a process infected by the same defects alleged here: shifting dates, shifting locations, contradictory sworn accounts, delayed reporting, law enforcement contamination, refusal to provide complete

materials, and a structural conflict in which SafeSport's internal narrative had already been used to justify criminal reporting and athletic discipline.

8. The seriousness of those defects was later recognized in the Florida criminal and expungement proceedings. In February 2025, the Seminole County Court entered a Supplemental Order concerning SafeSport. In that Order, the court stated:

> "SafeSport's report and information was provided to influence the present case prosecution."
>
> The court further stated:
>
> "In August, 2022, complying with the good faith obligation to provide discovery, the State learned that SafeSport filtered information, attempting to influence the Sheriff's investigation. The State learned that SafeSport provided an incomplete file, withholding exculpatory information and withholding witness statements potentially favorable to the defendant."
>
> The court later found:
>
> "Therefore, the court finds that it is clear, convincing, and beyond doubt: A. That the United States Center for SafeSport, Inc., perpetrated a fraud upon the court, the People of the State of Florida, the Sheriff's Office, the State's Attorney Office, and defendant;
>
> B. That the United States Center for SafeSport, Inc., intentionally withheld exculpatory evidence; and
>
> C. That the United States Center for SafeSport, Inc., acted in bad faith, intentionally, and with malice."

SafeSport sought certiorari relief from that order. On December 15, 2025, the Fifth District Court of Appeal dismissed SafeSport's petition.

9. K.M. brings this action to obtain declaratory relief, damages, injunctive relief where appropriate, and all other relief the law permits for Defendants' misconduct and for the injuries caused to her name, reputation, education, athletic opportunities, emotional well-being, and economic prospects. Before Defendants' conduct derailed her

trajectory, K.M. was an honor student, a USA Water Polo Junior Olympic participant, a high-performing water polo athlete, and a young adult entering college with athletic, coaching, instructional, educational, and economic opportunities. Defendants' conduct damaged those opportunities and imposed consequences that continued well beyond the dismissal of the criminal cases. Those consequences include the continuing appearance of criminal-case and SafeSport-related information in public-record and background-search systems, which can foreseeably affect employment, lending, housing, education, licensing, professional opportunities, and other reputation-dependent decisions for years.

## II. PARTIES

10. Plaintiff K.M. is a resident of Florida. At all relevant times, she was a water polo athlete and a participant in activities and organizations subject to the jurisdiction and practical control of SafeSport and USA Water Polo.

11. Defendant United States Center for SafeSport, Inc. ("SafeSport"), is a Colorado nonprofit corporation. Congress recognizes SafeSport as the independent national safe sport organization for the United States Olympic and Paralympic Movement. SafeSport exercises jurisdiction over national governing bodies, including USA Water Polo, with respect to safeguarding amateur athletes from abuse and determining an individual's opportunity to participate in amateur athletic competition.

12. SafeSport conducts business in Florida and purposefully directed conduct into Florida, including through reports, communications, investigations, proceedings,

and consequences involving K.M., Florida law enforcement, Florida prosecutors, Florida athletes, Florida witnesses, and Florida athletic participation.

13. Defendant USA Water Polo, Inc. is the national governing body for water polo in the United States. USA Water Polo is incorporated in California and maintains its headquarters and principal place of business in Irvine, California. It is therefore a citizen of California for purposes of diversity jurisdiction. USA Water Polo is subject to the Ted Stevens Olympic and Amateur Sports Act, the SafeSport Code, and the policies and procedures governing athlete membership, participation, discipline, and eligibility.

14. Defendant Scott Tripp is an individual who, on information and belief, resides in Colorado or another state outside Florida but purposefully directed conduct into Florida. Tripp was assigned by SafeSport as the investigator concerning K.M.'s report and related allegations. Acting individually, as SafeSport's investigator, and under color of his asserted mandatory-reporter role, Tripp contacted Florida law enforcement, identified K.M. as a suspect of a crime, supplied names of purported victims and witnesses, caused or materially contributed to law enforcement contact with E.C., and later directed or encouraged K.F. to make a police report in Florida. Tripp's conduct was purposefully directed toward Florida law enforcement, Florida witnesses, Florida prosecutors, Florida criminal proceedings, and K.M.'s Florida-based injuries.

15. At all material times, each Defendant acted individually and, where alleged, through agents, employees, representatives, advisors, investigators, attorneys, or persons acting in concert with them. SafeSport is responsible for the conduct of Tripp alleged herein because Tripp was assigned by SafeSport as the investigator concerning

K.M.'s report and related allegations, acted within the actual or apparent scope of his SafeSport assignment, used SafeSport's authority and processes when contacting Florida law enforcement and witnesses, and undertook the challenged conduct for or on behalf of SafeSport.

## III. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action includes a claim arising under the Sherman Act, 15 U.S.C. § 1. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1337 because this action arises under an Act of Congress regulating commerce and protecting trade and competition.

17. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of Florida. SafeSport is a citizen of Colorado. USA Water Polo is a citizen of California. On information and belief, Scott Tripp is a citizen of Colorado or another state other than Florida.

18. Plaintiff's claims also require the Court to consider SafeSport's federally recognized authority, the SafeSport Code, USA Water Polo's membership and participation rules, written agreements or incorporated procedures governing SafeSport response-and-resolution services, and the continuing effect of sanctions, records, restrictions, and eligibility consequences imposed through that framework.

19. Plaintiff seeks relief under 28 U.S.C. §§ 2201 and 2202 to determine the parties' rights and obligations arising from the SafeSport Code, USA Water Polo's

membership rules and participation agreements, written agreements or incorporated procedures governing SafeSport response-and-resolution services, third-party-beneficiary obligations, membership-based obligations, and equitable obligations, all as applied to the continuing effect of sanctions, records, restrictions, and eligibility consequences imposed through that framework. The requested declaratory relief therefore concerns the use, enforcement, and continuing effect of disciplinary records and eligibility consequences imposed through SafeSport's federally recognized authority over participation in amateur athletic competition.

20. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, supplies the remedial mechanism for declaring the parties' rights and granting further necessary or proper relief, while subject-matter jurisdiction rests independently on federal-question jurisdiction, commerce-based jurisdiction, and diversity jurisdiction.

21. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims because those claims form part of the same case or controversy as Plaintiff's federal antitrust claim. They arise from the same SafeSport reporting, investigation, disciplinary, criminal, eligibility, market-exclusion, and expungement events.

22. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Florida, including the law enforcement reporting, criminal investigation, criminal prosecution, court proceedings, witness statements, injury to K.M., and communications concerning the SafeSport file.

23. The Orlando Division is proper because the underlying Florida criminal cases were filed in Seminole County, Florida; the law enforcement and prosecution activity occurred in or around Seminole County; and K.M.'s injuries were suffered in this Division.

24. Personal jurisdiction exists over SafeSport because SafeSport purposefully directed conduct into Florida by receiving and investigating reports involving a Florida athlete, assigning an investigator who contacted Florida law enforcement, transmitting or causing information to be transmitted to Florida law enforcement and prosecutors, communicating with Florida witnesses, participating in or affecting Florida criminal proceedings, resisting Florida criminal-court and law-enforcement requests, and causing foreseeable injury to K.M. in Florida. SafeSport's conduct also constitutes business activity and tortious conduct directed into Florida within the meaning of Florida's long-arm statute and satisfies due process because SafeSport could reasonably anticipate being haled into court in Florida for injuries caused by its Florida-directed conduct.

25. Personal jurisdiction exists over USA Water Polo because USA Water Polo is the national governing body whose membership, participation, discipline, eligibility, and SafeSport-recognition rules affected K.M.'s Florida-based participation, eligibility, reputation, and athletic opportunities. USA Water Polo recognized, enforced, transmitted, relied upon, or failed to correct SafeSport restrictions, records, database entries, eligibility consequences, or participation consequences affecting K.M. in Florida, thereby causing or contributing to foreseeable injury in Florida.

26. Personal jurisdiction exists over Tripp because he purposefully directed conduct into Florida by contacting Florida law enforcement, identifying K.M. as a criminal suspect in Florida, supplying information intended to cause or contribute to Florida criminal investigation or prosecution, communicating with or directing Florida witnesses, and causing foreseeable injury to K.M. in Florida.

27. SafeSport's Code contains a forum-selection provision that SafeSport may contend applies to disputes related to the Code. That provision does not defeat venue here because Plaintiff's claims do not merely seek internal Code review and do not arise solely from a private athletic-disciplinary appeal. They arise from Florida-directed tortious conduct, Florida criminal process, Florida judicial proceedings, Florida witnesses, Florida subpoenas, Florida criminal-discovery orders, Florida law-enforcement requests, Florida injuries, and SafeSport's own purposeful use of Florida law-enforcement mechanisms.

28. Alternatively, to the extent the provision applies, it is unenforceable or should not be enforced as applied here because enforcement would be unreasonable, unjust, contrary to the public interest, and inconsistent with the administration of justice. The material witnesses, criminal court records, law-enforcement records, prosecution records, school records, subpoenas, court orders, and injuries are centered in Florida. Enforcing a Colorado forum provision would fracture claims arising from Florida criminal proceedings, burden Florida witnesses and records, and force K.M. to litigate Florida criminal-process injuries in a forum disconnected from the core events alleged herein.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. K.M. Reports Bullying and Is Converted from Claimant into Suspect

29. K.M. was a water polo athlete. In January 2022, conflict arose inside the water polo team environment involving K.M. and other athletes.

30. On January 31, 2022, after learning that E.C. had accused her of inappropriate contact during the January 30, 2022, team gathering, K.M. contacted school administrators and coaches and asked them to intervene. K.M. did not contact law enforcement, did not ask that E.C. be disciplined, and did not seek to turn the matter into a criminal accusation against anyone. Before that day's game, the coach spoke with K.M. and E.C. The coach later described the matter as a misunderstanding that the two athletes appeared to have resolved, stating that they were laughing and gave each other a high-five and hug after the discussion.

31. Seminole High School and Seminole County school system staff thereafter undertook an immediate investigation, secured witness statements, and involved school resource officers. During that process, E.C. and K.M. again addressed the issue before the team. According to the investigative materials, E.C. told the team that rumors had exaggerated what occurred, asked teammates not to think differently of either athlete, and asked that the matter be put behind them so the team could move forward.

32. That school investigation closed on or about February 5, 2022, without further criminal action or any report to local law enforcement concerning the alleged January 30, 2022, incident. The materials presently available further reflect that school administrators, coaches, and school resource officers had access to witness accounts

concerning the incident, yet none initiated a criminal report against K.M. before SafeSport later contacted the Seminole County Sheriff's Office.

33. In February 2022, after the school investigation closed without further action, K.M. continued to experience or perceive bullying, targeting, and team environment issues within the water polo program. K.M. was advised to report those concerns to SafeSport because SafeSport worked with water polo programs and had authority and resources to address athlete mistreatment, education, and team culture.

34. K.M. made such a report in February 2022. At that time, she was seeking assistance, protection, and intervention concerning bullying and team environment issues. She was not asking SafeSport to criminalize E.C., K.F., M.K., herself, or any other athlete, and she was not seeking to reopen a school matter that coaches and school officials had already treated as resolved without further action.

35. The February 2022 SafeSport report was made by K.M.'s stepfather, with K.M.'s assistance, and identified bullying by multiple athletes, including E.C. The report also identified unwanted sexual advances directed toward K.M. by male athletes and identified potential witnesses. The report was directed to K.M.'s request for athlete-safety assistance and protection, not to any request that SafeSport report K.M. or any other athlete to law enforcement. SafeSport assigned separate case numbers to K.M.'s reports, including, on information and belief, Case Nos. 2022-00497, 2022-00495, 2022-00496, and 2022-00409. SafeSport nevertheless did not meaningfully interview K.M. about those matters, did not request the available supporting evidence, and later closed the matters for insufficient information.

36. On or about April 1, 2022, SafeSport advised K.M. that her report had been placed in queue for assignment to an investigator. K.M. reasonably understood that the assigned investigator would contact her to investigate her report and obtain her account.

37. On April 6, 2022, SafeSport advised K.M. that she was listed as a claimant or reporter and that an investigator would be assigned to speak with her.

38. SafeSport's own communications reinforced K.M.'s reasonable understanding that she was seeking protection and assistance as a claimant. On or about February 14, 2022, SafeSport's Resource and Process Advisor communicated with K.M. and her family concerning the SafeSport process and available support resources. On or about February 15, 2022, SafeSport personnel identified K.M. as an adult claimant. On or about April 6, 2022, SafeSport again identified K.M. as a possible claimant in matters involving misconduct by others.

39. Those communications are material because SafeSport thereafter converted K.M. from claimant into respondent and caused or materially contributed to criminal process before first interviewing her or fairly testing her account. According to K.M.'s response to SafeSport's Third Amended Modified Decision, SafeSport generated a new case against K.M. on its own, without a complaint from any purported victim, and assigned Case No. 2022-00947, even though that case came after K.M.'s own February 2022 report and before SafeSport meaningfully addressed K.M.'s status as the reporting claimant.

40. SafeSport assigned Scott Tripp, a retired Colorado law enforcement officer, as investigator.

41. Instead, before interviewing K.M. about her own report and before affording her a meaningful opportunity to respond to any accusation against her, Tripp contacted the Seminole County Sheriff's Office on April 14 and April 15, 2022, and reported K.M. as a suspect of a crime.

42. Tripp included the names of purported victims and witnesses and represented that he was acting as a mandatory reporter.

43. Tripp's report was not a neutral transmission of information. At the time he contacted law enforcement, Tripp had not interviewed K.M., had not fairly tested the reliability of the accusation against her, had not reconciled the prior school investigation that closed without further action or police involvement, and had not obtained or considered K.M.'s complete account.

44. Tripp's initial report stated or suggested that E.C. had reported the event to SafeSport. That representation was materially false or misleading because E.C. had not made a police report or SafeSport report concerning the January 30, 2022, incident before Tripp contacted law enforcement on April 14 and April 15, 2022. Tripp also reported the alleged contact to law enforcement in materially more serious terms than the account K.M. had already provided to SafeSport, thereby presenting K.M. as a criminal suspect before interviewing her, testing her account, or reconciling the prior school investigation that had closed without further action or police involvement.

45. In the March 9, 2022, timeline provided to SafeSport, K.M. stated, in substance, that any contact was accidental, over clothing, and involved E.C.'s side rather than intentional contact with E.C.'s breast. Tripp nevertheless reported the matter to law

enforcement in a manner that described K.M. as a suspect and characterized the alleged contact in materially more serious terms.

46. Tripp's report caused law enforcement to contact E.C. on April 16, 2022.

47. Body-worn camera footage and law enforcement records show that E.C. did not know how police became involved.

48. On April 16, 2022, after Tripp's report, law enforcement interviewed E.C. and other people allegedly present at the January 30, 2022, team event.

49. Body-worn camera footage from April 16, 2022, shows that the interviewing officer directed or influenced witnesses concerning what should be included in their written voluntary statements.

50. On April 16, 2022, law enforcement went to K.M.'s home and advised her that if she did not come outside and tell her side of the story, the officer would not believe her and that this was her one chance to be heard.

51. K.M. requested representation before providing a statement. The officer refused.

52. K.M. was arrested at school on April 21, 2022.

53. The arrest occurred at K.M.'s high school. According to the materials presently available, school officials were contacted in advance of the arrest, and K.M. was removed from school in handcuffs in the presence or view of others. A photograph or image of the arrest was later circulated among students or on social media, causing additional humiliation, stigma, and reputational harm. On information and belief, E.C. or members of her family were informed in advance that the arrest would occur at school,

and an image of K.M.'s arrest was circulated among students or on social media shortly thereafter.

54. Furthermore, K.M. did not learn that SafeSport had converted her from claimant or reporter into respondent until after Tripp had already contacted law enforcement and after law enforcement had already contacted E.C. On or about April 26, 2022, Tripp contacted K.M. and referenced a Notice of Allegations dated April 25, 2022. Until that contact, K.M. reasonably believed any SafeSport investigator contact would concern the report made for her protection, not an allegation against her or a law enforcement referral that had already occurred.

**B. The E.C. Matter and the First Criminal Case**

55. The first criminal case arose from the alleged January 30, 2022, event involving E.C. The State charged K.M. with misdemeanor battery in Seminole County Court.

56. No one made a police report concerning the E.C. matter between January 30, 2022, and SafeSport's April 2022 report to law enforcement.

57. K.M. and E.C. remained in the same water polo environment between January 30, 2022, and April 2022. The initial January 31, 2022, accusation arose shortly after K.M.'s teammates selected her as a team captain after E.C. had actively sought a captain position. The later, more serious version of the accusation was not placed into the criminal process until after SafeSport contacted law enforcement in April 2022. This sequence, together with the ongoing team conflict involving K.M., E.C., and other

athletes, bears on motive, credibility, and whether the accusation was made or repeated in good faith.

58. E.C. could have reported the matter to local police if she believed police involvement was warranted. She did not do so before SafeSport's investigator contacted law enforcement.

59. By the time K.M. was arrested, witnesses had given statements to the school, to law enforcement, and to SafeSport, and contemporaneous text communications concerning the January 30, 2022, incident also existed. Those materials contained material inconsistencies concerning what contact allegedly occurred, whether it was accidental or intentional, whether it occurred over or under clothing, whether one or both hands were involved, whether breast contact occurred, whether the conduct was repeated, and how the participants themselves characterized the matter immediately afterward.

60. Those inconsistencies included material changes in E.C.'s own description of the alleged contact. On January 31, 2022, K.M. apologized in a contemporaneous exchange for accidentally touching E.C.'s side. In a separate text exchange that same day, E.C. stated that she did not remember whether the contact was under or over her shirt because it happened too quickly and referred to K.M.'s "*hand*."

61. In E.C.'s February 1 written statement to the school, she described wearing a crewneck over a crop top and bra and stated that K.M. put a hand beneath the first layer of clothing, but the statement did not describe the substantially more serious version later given to law enforcement. By April 16, 2022, E.C. told law enforcement that K.M. put

both hands up her shirt, grabbed her breasts, and repeatedly returned her hands after being told to stop. These changes were material to credibility, probable cause, SafeSport discipline, and K.M.'s defense.

62. Those witnesses included, among others, E.B., K.B., and C.H., whose accounts were material because they bore directly on the seating arrangement, the presence or absence of any visible commotion, and whether the alleged conduct could have occurred in the manner later described.

63. Those inconsistencies were exculpatory or impeachment information. They were material to whether K.M. should have been charged, disciplined, suspended, or publicly branded as an abuser.

**C. The K.F. Matter and the Second Criminal Case**

64. After the first accusation, SafeSport investigator Tripp communicated with K.F. concerning a separate alleged battery.

65. K.F. did not report any such alleged battery for approximately six months and came forward only after encouragement or direction connected to SafeSport's investigation.

66. Tripp interviewed K.F. on June 2, 2022. K.F. claimed K.M. touched her on January 21, 2022.

67. K.M. promptly provided evidence that she was not in the vicinity of K.F. on January 21, 2022.

68. The SafeSport file shows that Tripp returned to K.F. with K.M.'s evidence on July 7, 2022, and that K.F. then admitted she did not know the date of the alleged

touching and moved the time frame to approximately January 14 through January 16, 2022.

69. On July 8, 2022, SafeSport reissued or amended allegations to conform to the newly changed dates, thereby requiring K.M. to defend against a moving target.

70. At the Arbitration, M.K., another water polo athlete and alleged witness, testified that she and K.F. did not possess an independent recollection sufficient to identify the alleged date and instead attempted to reconstruct the event from Snapchat materials when preparing to go to law enforcement.

71. M.K. further testified, in substance, that K.F. contacted her for assistance concerning the allegation and that M.K. wanted to support or "back up" her friend. K.F. likewise testified concerning efforts to reconstruct and "figure" the facts out. Their subsequent inability to identify the correct date or location, and their reliance on reconstruction rather than independent recollection, materially undermines the reliability of the statements later provided to law enforcement.

72. On July 24, 2022, K.M. received a favorable temporary measures ruling in the SafeSport matter, allowing her to resume playing water polo.

73. After that ruling, Tripp continued to communicate with K.F. and directed or encouraged K.F. to go to local law enforcement to file charges against K.M.

74. K.F. made a police report on July 26, 2022. The police report reflects that Tripp directed K.F. to make the report.

75. Tripp directed or encouraged K.F. to make that report after K.M. had supplied evidence undermining K.F.'s original January 21, 2022, date, after K.F. had

changed the alleged date range, and after K.M. had obtained a favorable temporary-measures ruling allowing her to resume playing water polo. Tripp knew or had reason to know that a new police report would foreseeably expose K.M. to additional criminal process, athletic discipline, reputational harm, and eligibility consequences.

76. K.F.'s report led to a second criminal charge against K.M. in Seminole County, even though K.F.'s account had already shifted dates and was contradicted by evidence K.M. provided.

77. At the Arbitration, K.F. admitted under oath that the information she provided to the Seminole County Sheriff's Office was not truthful or was materially inaccurate, including the alleged dates, location, clothing, and circumstances of the incident.

78. At the Arbitration, E.C., whom K.F. identified as a witness, testified under oath that she did not witness the K.F. incident.

79. At the Arbitration, M.K. testified under oath that her sworn statement to law enforcement was not factually correct.

**D. SafeSport's File, Withheld Materials, and the Criminal Proceedings**

80. The SafeSport file was central to the criminal defense because SafeSport's investigation generated and collected statements, notes, communications, recordings, and impeachment information bearing on the reliability of the accusations.

81. SafeSport's own investigation was substantial. According to SafeSport's representations in the related criminal and post-criminal proceedings, its investigation generated approximately 680 pages of investigative materials and multiple witness

interviews before the JAMS arbitration. Those materials were significant because many of the same witnesses had provided statements to Seminole County Schools, the Seminole County Sheriff's Office, and SafeSport investigators, making inconsistencies among those statements central to K.M.'s defense.

82. On January 23, 2023, Judge John L. Woodard granted K.M.'s amended motion to compel discovery and ordered the Office of the State Attorney to provide supplemental discovery consisting of evidence in the State's possession and/or in SafeSport's possession within ten days, or to provide a sworn written response showing good cause why the order could not be complied with. The order was entered in pending criminal prosecutions and concerned evidence believed to include exculpatory information, impeachment evidence, inconsistent witness statements, and investigative materials bearing directly on K.M.'s defense.

83. K.M. then spent much of the criminal case trying to obtain the SafeSport file. She sought statements, communications, recordings, transcripts, and other materials bearing on the credibility of the accusations.

84. SafeSport had already produced portions of its investigative materials to the prosecution, and the State produced portions of those materials in criminal discovery. After reviewing the production, K.M.'s counsel determined that significant portions of the SafeSport file remained missing, including additional witness interviews, communications with witnesses, investigator notes, audio recordings, correspondence with law enforcement, and investigative materials developed after the initial production. The Supplemental Order quoted the problem directly:

> "In August, 2022, complying with the good faith obligation to provide discovery, the State learned that SafeSport filtered information, attempting to influence the Sheriff's investigation. The State learned that SafeSport provided an incomplete file, withholding exculpatory information and withholding witness statements potentially favorable to the defendant."

Later SafeSport materials, including materials connected to the investigation report and arbitration process, revealed additional inconsistencies, impeachment information, and exculpatory evidence that had not been timely provided in the criminal cases.

85. SafeSport did not produce the full file voluntarily. It invoked confidentiality, resisted production, and failed to provide material information needed for K.M.'s defense.

86. SafeSport was not unaware of the criminal discovery proceedings. The Supplemental Order stated:

> "January 23, 2023 the court issued an Order requiring the production of 'evidence currently … in the possession of SafeSport in 10 days from the date of this Order or provide a sworn, written response showing good cause why this Order cannot be complied with.'"

The Supplemental Order further stated:

> "Also on January 23, 2023, a subpoena duces tecum issued concurrent with the Order of production to SafeSport."

The Order then identified missing SafeSport materials, including "Any and all reports prepared by SafeSport for the Seminole County Sheriff's Department," "Any and all correspondence including but not limited to any video, audio, and, or notes of conversations between SafeSport and [witness] E.C. that occurred prior to April 14, 2022," "Any and all correspondence including but not limited to any video, audio, and, or notes

of conversations between SafeSport and ANY alleged witness that occurred prior to April 14, 2022," and additional communications, notes, audio, video, reports, and post-August 3, 2022 materials.

The Supplemental Order then stated:

> "In a letter dated January 26, 2023, counsel for SafeSport, Mr. Joe Zonies acknowledged receipt of the Order and the subpoena. Counsel attempted to object, refused any cooperation, and refused compliance."

87. The Supplemental Order further stated:

> "On February 8, 2024, SafeSport counsel, Mr. Zonies, replied to the Order via e-mail, wherein he declared his refusal to comply with this court's Order. Mr. Zonies compounded his contempt for the court by sending a similar e-mail letter to the State, also indicating his refusal to comply with the Order."

The Supplemental Order continued:

> "Mr. Zonies made a material misrepresentation to this court, specifically mis-citing: 'As required by federal statute, the [SafeSport] Center's files are considered 'confidential' and not subject to civil subpoena. 36 U.S.C. § 220541(f)(4)(C)(i).'"

The Order further stated:

> "Mr. Zonies intentionally failed to represent that the Order was issued by this court, vested with criminal court authority, and not as a civil court matter. Mr. Zonies intentionally failed to reference or adhere to the dictates of 36 U.S.C. § 220541(f)(4)(C)(ii), which provides: Nothing in this subparagraph shall be construed to prohibit the [SafeSport] Center from providing work product described in clause (i) to a law enforcement agency for the purpose of assisting in a criminal investigation."

88. The materials produced were selective and incomplete. K.M. was therefore required to pursue multiple subpoenas duces tecum, criminal discovery motions, and

other efforts to obtain records, recordings, witness interviews, communications, investigator notes, and impeachment information that should have been disclosed earlier.

89. The timing of SafeSport's disciplinary actions further supports K.M.'s claim of bad faith and retaliation. After K.M. sought the SafeSport file for use in the criminal proceedings and after the criminal court directed efforts to obtain those materials, SafeSport continued to resist production and later imposed or reinstated athletic restrictions while the dispute over access to the file remained ongoing.

90. SafeSport's refusal was not a neutral invocation of privacy. SafeSport had injected the matter into the criminal system by reporting K.M. to law enforcement, providing information to law enforcement, and causing or encouraging additional criminal reporting.

91. SafeSport could not fairly initiate or materially contribute to criminal process and then intentionally withhold exculpatory evidence, impeachment information, and other materials necessary to test whether that process rested on true, complete, and reliable statements.

92. SafeSport's involvement in the criminal proceedings did not end with the initial reports to law enforcement. On information and belief, SafeSport remained in communication with the State concerning the criminal proceedings, resisted or delayed production of SafeSport materials requested for K.M.'s defense, and thereby prolonged the criminal cases and increased the pressure on K.M. to defend herself through trial settings.

93. The criminal cases required K.M. to appear for arraignments, pretrial conferences, motion hearings, docket reviews, jury selections, and trial settings over an extended period.

94. On June 19, 2023, and June 21, 2023, the State entered nolle prosequi in the two criminal cases.

95. The dismissal of the criminal cases did not restore K.M.'s lost athletic opportunities, reputation, expenses, or emotional well-being. By then, K.M. had been arrested, prosecuted, publicly accused, suspended from athletic participation, forced to incur expenses, and subjected to reputational harm.

**E. The Causal Chain from SafeSport's Conduct to K.M.'s Injuries**

96. K.M.'s injuries did not begin with an independent police report by E.C. or K.F. They began after K.M. contacted SafeSport for help and SafeSport redirected the matter against her.

97. First, K.M. reported bullying to SafeSport in February 2022. SafeSport listed K.M. as a claimant or reporter and advised her that an investigator would be assigned to speak with her.

98. Second, before SafeSport's investigator interviewed K.M., and before SafeSport had afforded her a meaningful opportunity to respond, SafeSport investigator Scott Tripp contacted the Seminole County Sheriff's Office on April 14 and April 15, 2022, and identified K.M. as a suspect of a crime.

99. Third, no police report concerning the E.C. matter had been made between January 30, 2022, and Tripp's April 2022 contact with law enforcement. Law enforcement contacted E.C. only after Tripp's report.

100. Fourth, Tripp's report caused or materially contributed to law enforcement's investigation of K.M., the collection of witness statements, the involvement of prosecutors, and the first criminal charge against K.M.

101. Fifth, after K.M. provided evidence undermining K.F.'s original allegation that an incident occurred on January 21, 2022, K.F. changed the alleged date range to approximately January 14 through January 16, 2022, and SafeSport reissued or amended the allegations to conform to that changed account.

102. Sixth, after K.M. received a favorable temporary measures ruling allowing her to resume playing water polo, Tripp continued communicating with K.F. and directed or encouraged K.F. to make a police report on July 26, 2022.

103. Seventh, K.F.'s July 26, 2022, police report caused or materially contributed to the second criminal charge against K.M., even though the allegation had already shifted and was contradicted by evidence K.M. had supplied.

104. Eighth, during 2022 and 2023, SafeSport relied on the existence of criminal charges, the same challenged statements, and the same tainted investigative record to support athletic consequences against K.M., including suspension, probationary restrictions, adverse records, and eligibility consequences.

105. SafeSport then resisted or delayed production of information bearing on the credibility of the same accusations it had helped place before law enforcement and athletic authorities.

106. The criminal cases required K.M. to appear repeatedly in court, defend herself against two misdemeanor battery prosecutions, incur legal and investigative expenses, suffer reputational harm, lose athletic opportunities, and endure the stigma of being accused of criminal and sexual misconduct.

107. The State ultimately entered nolle prosequi in both criminal cases on June 19, 2023, and June 21, 2023. By then, the harm had already occurred. K.M. had been arrested at school, prosecuted, subjected to repeated court appearances, impaired in her athletic participation, stigmatized in the water polo community, and forced to litigate for access to information that should have been disclosed or corrected earlier.

108. Before Defendants' conduct derailed her athletic and educational trajectory, K.M. had concrete athletic, educational, and economic opportunities. She had been accepted to the University of Central Florida for the Summer 2022 semester in Psychology, Human Factors Psychology Track. After advising the UCF water polo coach of her acceptance, she was invited to begin practicing with the UCF water polo program and attended her first UCF practice on or about March 7, 2022.

109. K.M. also had opportunities to earn money teaching swim lessons and coaching younger athletes. She had coached or assisted with younger swimmers and athletes, was a high-performing student-athlete, and graduated with honors. As a result of the arrest, criminal prosecutions, SafeSport proceedings, suspension, and resulting

reputational consequences, K.M. lost athletic and economic opportunities, experienced disruption to her college life and participation opportunities, lost or impaired coaching and instructional opportunities, and required mental-health counseling.

110. The consequences continued after the criminal cases were dismissed. On information and belief, in or about September 2023, an anonymous letter was delivered to or discovered by a University of Central Florida sports-club administrator. The letter falsely stated or implied that K.M. had taken plea deals in two battery cases and repeated allegations of inappropriate touching. K.M. did not take plea deals. The State entered nolle prosequi in both cases. The continued circulation of the challenged narrative contributed to additional university, athletic, reputational, housing, social, coaching, and economic consequences, including academic probation, lost or impaired coaching opportunities, loss of a sorority opportunity, and loss or impairment of student housing or campus-related benefits.

111. The long-term consequences are not speculative. A September 3, 2026 background-search report for Kelsey Lela McMullan reflects that public-record and background-search systems can still associate her name with the dismissed Seminole County misdemeanor battery cases, including Case Nos. 2022-MM-001423 and 2022-MM-002950, even though both cases are listed as nolle prosequi. The same report also displays SafeSport-related entries or descriptors including "Temporary Suspension," "Suspension," "Ineligible," "Physical Misconduct," "Sexual Misconduct," "Criminal Disposition," and "Allegations of Misconduct." Plaintiff does not allege that this particular report may lawfully be used for employment, lending, housing, education,

licensing, or other FCRA-regulated decisions. Rather, the report illustrates the foreseeable and continuing harm caused when criminal-case information and SafeSport disciplinary labels enter public-record, data-aggregation, and background-search systems.

112. The causal connection between SafeSport's conduct and the criminal proceedings is further supported by statements made during the criminal proceedings. According to the SafeSport file and related materials, the prosecutor acknowledged in substance that the criminal cases likely would not have reached that posture but for SafeSport's involvement.

113. K.M.'s injuries were the foreseeable result of that chain of conduct. A reasonable person or organization in SafeSport's, USA Water Polo's, or Tripp's position would understand that accusing an athlete of battery, sexual misconduct, or nonconsensual physical contact, transmitting those accusations to law enforcement and athletic authorities, and maintaining those accusations after material contradictions surfaced would foreseeably cause arrest, prosecution, exclusion from sport, reputational harm, emotional distress, legal expense, and lost educational, athletic, and economic opportunities.

**F. The SafeSport Arbitration and Sanctions**

114. Separate from the criminal cases, SafeSport conducted its own disciplinary process concerning K.M.'s eligibility and participation in water polo and the Olympic and Paralympic Movement.

115. On November 9, 2023, SafeSport issued a lengthy confidential investigation report and imposed disciplinary sanctions against K.M., including a 289-day suspension credited as time served, three years of probation, no contact restrictions, and additional SafeSport training.

116. A SafeSport sanction is not merely an internal reprimand. For an athlete in a national governing body sport, SafeSport restrictions can affect the athlete's ability to participate in practices, competitions, team activities, coaching, instruction, facilities, events, and other opportunities connected to the Olympic and Paralympic Movement and its national governing bodies. SafeSport records and eligibility consequences can also be communicated, recognized, or enforced by national governing bodies, member clubs, coaches, administrators, and others responsible for athlete participation.

117. K.M. requested de novo arbitration. The arbitration occurred on December 8 and 11, 2023.

118. SafeSport will contend that, after the Arbitration, the arbitrator issued a reasoned decision on December 19, 2023, finding a SafeSport Code violation by a preponderance of the evidence.

119. K.M. alleges that the arbitration did not cure the defects in SafeSport's investigation because the proceeding was built on a record infected by unreliable and shifting accusations, undisclosed or incompletely disclosed materials, law enforcement contamination, and SafeSport's own institutional interest in defending the report it had already made to law enforcement.

120. K.M. further alleges that SafeSport's arbitration process, as applied here, did not provide a meaningful cure for the investigative defects because the process relied heavily on SafeSport's investigative record rather than a full and reliable testing of the facts, including a fair consideration of exculpatory and impeachment evidence that materially undermined the accusations already used to justify criminal reporting and athletic discipline.

121. The arbitration history also revealed another serious credibility and process problem involving what SafeSport treated as a purported third claimant or additional allegation, referred to herein as the "*Claimant 3 / locker-room allegation*." According to K.M.'s response to SafeSport's Third Amended Modified Decision, the prior arbitration was cancelled because E.C. claimed that her initial statements included seeing K.M. touch a naked girl in a locker room approximately two weeks before E.C.'s alleged event. In those materials, K.M. identified that E.C. had injected an additional story involving an alleged incident in a locker room. According to those materials, E.C. told law enforcement on April 16, 2022, and told SafeSport investigator Scott Tripp on April 21, 2022, that she had seen K.M. touch another girl in a locker room. E.C. described the alleged incident as involving a girl from a different team and stated, in substance, that K.M. grabbed the girl's breasts and said words to the effect of, "*Oh, I like these*."

122. E.C. later identified the person as K.F., but that identification was materially inconsistent with K.F.'s own account, the account of the alleged witness M.K., and other evidence known to SafeSport. According to K.M.'s response to the Third Amended

Modified Decision, SafeSport knew as early as June 2, 2022, that K.F.'s account and M.K.'s account did not match E.C.'s locker-room account.

123. The later investigation further undermined E.C.'s account. According to K.M.'s response, E.C. later stated that she was wrong in her recollection, that she did not see K.F. being groped, that she had only heard about the alleged incident, that the person she recalled was some other person whom she could not identify or name, and that she barely got a look at the person. K.M. alleged that E.C. had previously told law enforcement and SafeSport that she knew exactly who the person was. This contradiction was material because SafeSport and Tripp had previously treated E.C.'s locker-room account as significant enough to affect the arbitration process and the continuing proceedings against K.M.

124. K.M. also submitted evidence that the alleged locker-room scenario could not have occurred as described. According to K.M.'s response, the locker room for the relevant January 2022 dates was not being used by water polo, meaning the alleged locker-room event could not have occurred as E.C. described in front of a group of Lake Nona girls changing. K.F., M.K., and M.S. were also asked whether they had ever heard about a naked girl being groped by K.M. toward a Lake Nona girl, and each stated that they had never heard such comments.

125. Rather than treating these contradictions as material impeachment and exculpatory evidence, SafeSport omitted, restricted, or failed to provide K.M.'s contrary evidence, prior investigative information, prior witness statements, impeachment

information, and exculpatory materials to the decisionmakers or investigators responsible for evaluating the later allegations.

126. SafeSport then disregarded the evidence and continued to rely on a record infected by materially inconsistent witness accounts. This supports K.M.'s allegations that SafeSport failed to fairly test the accusations, intentionally withheld exculpatory evidence or restricted access to exculpatory investigative information, and continued to pursue or maintain sanctions against K.M. after material contradictions surfaced. It also supports K.M.'s allegation that SafeSport used new, modified, or harmonized allegations to continue pursuing K.M. after the original factual theories had materially collapsed.

127. The Claimant 3 / locker-room allegation is material because it shows that SafeSport did not simply make an isolated investigative error. After E.C.'s account shifted, after K.F.'s and M.K.'s accounts failed to match E.C.'s locker-room account, after E.C. later retreated from her identification of K.F., and after K.M. submitted evidence that the locker-room scenario could not have happened as stated, SafeSport continued to maintain or rely upon a disciplinary record against K.M. rather than treating those contradictions as exculpatory and impeachment evidence.

128. The Arbitration record contains admissions that materially undermine the criminal accusations and the credibility of the statements attributed to E.C., K.F., and M.K.

129. Those admissions include K.F.'s admission that her sworn information to the Sheriff's Office contained serious errors; E.C.'s testimony that she did not witness the K.F. incident; and M.K.'s testimony that her sworn statement was factually incorrect.

130. After the Arbitration, SafeSport continued to treat K.M. as disciplined. Although the suspension was credited as time served, she remained subject to probation, no contact restrictions, additional training requirements, and adverse SafeSport records affecting her participation in water polo.

131. USA Water Polo, as the national governing body for water polo, gave effect to SafeSport's disciplinary process and resulting eligibility consequences by recognizing, enforcing, transmitting, or relying upon SafeSport's restrictions, records, notices, database entries, or participation consequences affecting K.M.'s ability to participate in water polo. USA Water Polo continued to recognize or give effect to those consequences after facts emerged undermining the reliability of the accusations and the fairness of the process.

**G. The Expungement Proceedings and Supplemental Order**

132. After the State entered nolle prosequi in the two criminal cases on June 19, 2023, and June 21, 2023, K.M. petitioned to expunge the two criminal cases.

133. The State objected because K.M. sought expungement of two cases, requiring K.M. to show that the cases were related or otherwise eligible for expungement.

134. In January 2024, K.M. submitted materials and arguments concerning the SafeSport process, the criminal accusations, and the contradictions revealed in the Arbitration.

135. During the expungement proceedings, the criminal court again sought materials from SafeSport that bore on the reliability of the accusations and the fairness of the criminal process. On February 1, 2024, the court ordered SafeSport to produce the

audio/video recordings or transcripts of the JAMS arbitration under seal. On or about February 8, 2024, SafeSport again refused compliance through counsel and continued asserting confidentiality.

136. SafeSport's refusal continued even after law enforcement independently sought the same materials. The Supplemental Order stated:

> "On April 24, 2024, Sheriff's Detective Mike Pivowar, e-mailed SafeSport's attorney Mr. Zonies a letter requesting records and information in connection with the ongoing criminal investigation, specifically seeking the audio/visual recordings or transcripts of the JAMS arbitration, noting that while SafeSport's work product may be confidential, there is a clear exception to cooperate with law enforcement to assist with a criminal investigation."

The Supplemental Order further stated:

> "On May 3, 2024, Detective Pivowar sent another e-mail to Jessica Perrill, SafeSport's General Counsel and Vice President of Response and Resolutions, again requesting records and information in connection with SafeSport's investigation, specifically the audio/visual recordings or transcripts of the JAMS arbitration pursuant to 36 U.S.C. § 220541(f)(4)(C)(ii)."

The Order then stated:

> "Neither SafeSport, Mr. Zonies, nor Ms. Perrill acknowledged or responded to Detective Pivowar's communications. Thereafter, on May 20, 2024, Detective Pivowar issued a criminal subpoena for the audio/visual recordings or transcripts of the JAMS arbitration conducted on December 8 and 11, 2023."

137. The Supplemental Order stated:

> "The exculpatory information is and was within the knowledge, custody, and control of SafeSport."

The Order further stated:

> "The exculpatory information is and was within a SafeSport file that was the subject of numerous court orders and properly issued subpoenas."

The Order further stated:

> "The Seminole County Sheriff's Office, the State's Attorney Office, and defense counsel went above and beyond any duty, and made every reasonable and good faith effort to obtain the exculpatory material and compliance by SafeSport to no avail."

The court then found:

> "Therefore, the court finds that it is clear, convincing, and beyond doubt:
>
> A. That the United States Center for SafeSport, Inc., perpetrated a fraud upon the court, the People of the State of Florida, the Sheriff's Office, the State's Attorney Office, and defendant;
>
> B. That the United States Center for SafeSport, Inc., intentionally withheld exculpatory evidence; and
>
> C. That the United States Center for SafeSport, Inc., acted in bad faith, intentionally, and with malice."

138. The Supplemental Order also stated:

> "The United States Center for SafeSport, Inc., violated defendant's constitutional right to due process, intentionally withholding exculpatory evidence from the court, the State's Attorney, and the defendant. Suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Floyd v. State*, 902 So. 2d 775, 777-778 (Fla 2005). Brady v. Maryland, 373 U.S. 83, 87 (1963). Also see *Gardner v. Florida*, 430 U.S. 349 (1977) (Intentionally withholding presentence investigation material is violation of due process). Here, the court, the State, and the defendant operated in good faith, but was repeatedly blocked for over two years. SafeSport repeatedly and knowingly interfered with the investigation."

139. The Supplemental Order further stated:

> "SafeSport withholding exculpatory evidence is akin to an intentional destruction of evidence. SafeSport's actions raise a rebuttable presumption that the hidden evidence was adverse to the claims. Seaway Biltmore, Inc. v. Abuchaibe, 348 So. 3d 23 (Fla DCA 3d Dist. 2022). Here, SafeSport not only failed to dispute the presumption, it intentionally withheld exculpatory evidence. Moreover, the court has clear, convincing, unrebutted testimony that SafeSport had specific knowledge that its reports to the Sheriff were false and fraudulent."

140. The Supplemental Order concluded:

> "WHEREUPON IT IS ORDERED AND ADJUDGED: a) that the United States Center for SafeSport, Inc., perpetrated a fraud upon the Court, the People of the State of Florida, the Sheriff's Office, the State's Attorney Office, and defendant; b) that the United States Center for SafeSport, Inc., intentionally withheld exculpatory evidence; c) that the United States Center for SafeSport, Inc., acted in bad faith, intentionally, and with malice; and d) that the court finds the evidence of fraud, collusion, pretense, and similar wrongdoing to be clear, convincing, intentional, and beyond doubt."

141. On March 27, 2025, SafeSport filed a petition for *writ of certiorari* challenging the Supplemental Order.

142. On December 15, 2025, the Fifth District Court of Appeal dismissed SafeSport's petition. SafeSport later filed a Motion to Vacate in the Seminole County Court. On July 10, 2026, the Seminole County Court changed the caption associated with the Supplemental Order but left the findings of fact and conclusions of law unchanged. Plaintiff does not rely solely on the final outcome of that motion for purposes of this Complaint, but SafeSport's continued effort to avoid the Supplemental Order further illustrates the ongoing controversy concerning its records, positions, and continued reliance on the challenged process.

143. Plaintiff does not rely solely on the Supplemental Order, the dismissal of the certiorari petition, or the July 10, 2026, order concerning SafeSport's Motion to Vacate. Plaintiff relies on the underlying facts alleged in this Complaint, including the timing of SafeSport's law-enforcement report, the absence of prior criminal reporting, the shifting dates and locations, the later sworn admissions, the withheld or delayed materials, and the continued use of the challenged record to impose criminal, athletic, reputational, and eligibility consequences.

144. Plaintiff further alleges that SafeSport is barred, estopped, or precluded from relitigating issues necessarily decided against it in the Supplemental Order, including findings concerning intentional withholding of exculpatory evidence, bad faith, malice, interference with the investigation, and fraud upon the court. Under the Full Faith and Credit Act, 28 U.S.C. § 1738, this Court must give the same preclusive effect to the Seminole County Court's Supplemental Order as would be given by a Florida court. The Supplemental Order is a final judgment on the merits by a court of competent jurisdiction. The issues decided therein, including that SafeSport "*perpetrated a fraud upon the Court, the People of the State of Florida, the Sheriff's Office, the State's Attorney Office, and defendant,*" that SafeSport "*intentionally withheld exculpatory evidence*," and that SafeSport "*acted in bad faith, intentionally, and with malice*," are identical to the issues K.M. seeks to litigate in this action.

145. SafeSport had a full and fair opportunity to litigate those issues in the Seminole County proceedings through the subpoena process, and its subsequent certiorari petition challenging the Supplemental Order was dismissed by the Fifth District

Court of Appeal on December 15, 2025. SafeSport's later Motion to Vacate was denied on the merits, with the court leaving its findings of fact and conclusions of law unchanged. SafeSport's argument that it was not a party to the criminal proceeding does not defeat collateral estoppel because the mutuality-of-parties requirement has been relaxed for defensive use of collateral estoppel. *See Zeidwig v. Ward*, 548 So. 2d 209, 212 (Fla. 1989) (modifying mutuality requirement and allowing defensive collateral estoppel where party against whom estoppel is asserted had a full and fair opportunity to litigate the issue).

146. SafeSport's repeated refusal to comply with court orders and its deliberate withholding of exculpatory evidence constitute fraud upon the court, which warrants preclusion. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) ("fraud upon the court" calls for complete denial of relief). SafeSport is therefore collaterally estopped from relitigating the findings in the Supplemental Order that it perpetrated fraud, intentionally withheld exculpatory evidence, and acted in bad faith and with malice. Alternatively, the doctrine of judicial estoppel bars SafeSport from taking a position in this litigation that contradicts the findings of the Seminole County Court.

147. Even if the Court determines that SafeSport is not formally bound by collateral estoppel due to its non-party status in the criminal proceeding, the Supplemental Order is entitled to significant evidentiary weight. The findings of the Seminole County Court are highly probative of SafeSport's bad faith, malice, and intentional misconduct. The court's findings were based on extensive evidence,

including testimony from witnesses, law enforcement records, and court orders, and were reached after SafeSport had a full opportunity to participate through the subpoena process. The dismissal of SafeSport's certiorari petition by the Fifth District Court of Appeal further confirms the validity of those findings. Plaintiff does not rely solely on the Supplemental Order, but the Order's findings are strong evidence of the facts alleged in this Complaint and support Plaintiff's claims for damages, punitive damages, and equitable relief.

## V. APPLICABLE ORGANIZATIONAL FRAMEWORK

148. SafeSport is the independent national safe sport organization for the United States Olympic and Paralympic Movement. SafeSport exercises jurisdiction over national governing bodies, including USA Water Polo, with respect to safeguarding amateur athletes from abuse and determining an individual's opportunity to participate in amateur athletic competition. Federal law is relevant to the background and structure of that authority, but Plaintiff's claims for relief are based on Defendants' own policies, incorporated procedures, membership rules, participation rules, written agreements, third-party-beneficiary obligations, and equitable duties.

149. The SafeSport Code establishes mechanisms for reporting, investigating, and resolving allegations of abuse, and requires that those mechanisms include fair notice, an opportunity to be heard, protection for privacy and safety, and procedural due process in investigations, sanctions, temporary measures, and other disciplinary actions taken against individuals under SafeSport's jurisdiction.

150. SafeSport's authority is not ordinary private club authority. Through federal recognition, national governing body incorporation, mandatory enforcement through the Olympic and Paralympic Movement, public facing disciplinary records, and required recognition by national governing bodies, SafeSport controls or substantially influences whether an athlete may participate in sports governed by national governing bodies, including USA Water Polo.

151. In practical effect, a SafeSport decision can restrict an athlete's participation, coaching, instruction, team activity, competition access, institutional standing, and reputation throughout the Olympic and Paralympic Movement. Because SafeSport relies on national governing bodies to recognize, transmit, implement, or enforce sanctions and eligibility consequences, USA Water Polo retained independent duties to K.M. and could not simply give effect to a defective SafeSport process without regard to her membership, participation, and procedural rights.

152. In practical and economic terms, SafeSport and USA Water Polo operate as gatekeepers for meaningful participation in the recognized water polo ecosystem. There is no fully equivalent alternative to USA Water Polo-recognized participation for athletes, coaches, instructors, clubs, teams, and participants seeking access to sanctioned competition, recognized eligibility, team participation, coaching opportunities, athlete-development pathways, and reputation-dependent opportunities within the Olympic and Paralympic Movement.

153. When SafeSport imposes restrictions and USA Water Polo recognizes, transmits, or enforces those restrictions without independent review, the practical effect

is not merely an internal reprimand. It can exclude an athlete or participant from meaningful participation, diminish coaching and instructional opportunities, impair future athletic and educational pathways, and create long-term reputational and economic consequences.

154. On information and belief, the relationship among SafeSport, the United States Olympic and Paralympic Committee, and national governing bodies is also governed by written agreements, policies, and incorporated procedures, including agreements requiring SafeSport to provide intake, investigatory, adjudicatory, hearing, response, and resolution services for the Olympic and Paralympic Movement. K.M. was an intended beneficiary of those policies, agreements, and incorporated procedures because they were designed to govern how SafeSport and national governing bodies receive, investigate, resolve, sanction, recognize, and enforce allegations and eligibility consequences affecting athletes and participants such as K.M.

155. Although SafeSport has repeatedly taken the position in litigation that it is not a state actor, its authority as applied to K.M. was not ordinary private association authority. SafeSport exercised congressionally recognized, nationwide disciplinary authority within the Olympic and Paralympic Movement; controlled or substantially influenced K.M.'s ability to participate in water polo; initiated or materially contributed to criminal investigation in Florida; communicated with law enforcement and prosecutors; maintained investigative materials bearing on criminal defense; resisted criminal court and law enforcement requests for those materials; and maintained or

caused recognition of eligibility consequences that affected K.M.'s athletic, educational, reputational, and economic opportunities.

156. SafeSport's position creates the precise accountability gap at issue in this case. SafeSport claims public facing authority when it receives reports, investigates alleged abuse, identifies suspects, transmits information to law enforcement, imposes sanctions, and causes national governing bodies to enforce participation consequences. Yet SafeSport claims private status when an accused athlete seeks the procedural protections ordinarily required when a person is investigated, accused, publicly stigmatized, restricted, or deprived of important participation and reputational interests.

157. K.M. does not allege that every SafeSport investigation is state action or that every good-faith mandatory report creates liability. K.M. alleges that SafeSport crossed the line here by using its federally recognized authority and law enforcement access to convert a claimant into a criminal suspect, by helping place unreliable allegations into the criminal process before fairly testing them, and by continuing to enforce or give effect to records and sanctions derived from that defective process after material contradictions surfaced.

158. K.M. was not merely an athlete affected by SafeSport's disciplinary process. She was also a paid participant in the aquatics instruction, swim-instruction, private-lesson, water polo coaching, and athlete-development services market. Before SafeSport imposed the suspension and related eligibility consequences, K.M. worked as a full-time swim instructor with Seminole Aquatics, a USA Water Polo club subject to USA Water

Polo and SafeSport rules, where she earned approximately $20.00 per hour. K.M. also provided private swim lessons for compensation.

159. K.M.'s work at Seminole Aquatics required SafeSport clearance, USA Water Polo good-standing status, SafeSport training, background screening, eligibility status, or compliance with USA Water Polo and SafeSport requirements. When SafeSport suspended K.M., USA Water Polo eligibility consequences made her ineligible to participate in the USA Water Polo system, and Seminole Aquatics removed her from her paid swim-instruction position.

160. Upon information and belief, Emily Cummings obtained the same or substantially similar paid work K.M. lost, including the same job, same hours, same clients, same classes, or same paid instruction opportunities. Parents, students, and clients who wished to receive instruction from K.M. were deprived of that choice because of SafeSport's suspension and USA Water Polo's automatic recognition or enforcement of that suspension.

161. After K.M. obtained relief from temporary measures, she coached water polo at Patriot Aquatics. K.M. lost that coaching position when SafeSport suspended her again, and she returned after the suspension was lifted. This removal-and-return sequence confirms that SafeSport and USA Water Polo eligibility consequences operated as practical gatekeeping conditions for paid coaching and instruction opportunities.

162. On information and belief, automatic recognition and enforcement of SafeSport suspensions, restrictions, disciplinary labels, and eligibility consequences is standard practice within USA Water Polo and the Olympic and Paralympic Movement.

The challenged conduct therefore did not merely injure K.M. in isolation. It reflects an enforcement structure that can exclude coaches, instructors, athletes, and participants from paid opportunities without independent review by the national governing body and without adequate safeguards against false, incomplete, tainted, or unreliable disciplinary labels.

163. SafeSport and USA Water Polo could have used less restrictive alternatives to protect athlete safety without excluding K.M. from paid coaching, instruction, and athlete-development opportunities. Those alternatives included prompt neutral review, temporary confidential restrictions, tailored no-contact conditions, supervised participation, nonpublic interim status, independent USA Water Polo review before club-level enforcement, correction or removal of tainted records after material contradictions surfaced, and refusal to give continuing effect to disciplinary labels derived from incomplete or unreliable information.

164. K.M. does not challenge legitimate athlete-safety rules, good-faith abuse reporting, or reasonable eligibility standards designed to protect athletes. K.M. challenges Defendants' automatic enforcement and recognition of tainted restrictions, disciplinary labels, eligibility consequences, and records that excluded her from paid instruction, coaching, and athlete-development opportunities after Defendants knew or should have known that the underlying accusations were materially incomplete, unreliable, contradicted, or tainted.

**COUNT I - DECLARATORY JUDGMENT AND EQUITABLE RELIEF CONCERNING CONTRACTUAL AND MEMBERSHIP-BASED DUTIES**
**Against SafeSport and USA Water Polo**

165. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 79 through 144 concerning SafeSport's file, withheld materials, the criminal proceedings, causation, arbitration, sanctions, Claimant 3 allegations, omitted or restricted exculpatory evidence, continuing records, the expungement proceedings, the Supplemental Order, and issue-preclusion allegations; and paragraphs 145 through 161 concerning the organizational framework, contractual and membership-based obligations, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

166. K.M. seeks prospective declaratory and equitable relief concerning sanctions, records, eligibility restrictions, participation consequences, disciplinary determinations, database entries, law enforcement-related records, and institutional communications maintained, transmitted, recognized, or enforced through the SafeSport Code, USA Water Polo membership and participation rules, written agreements or incorporated procedures governing SafeSport response-and-resolution services, third-party-beneficiary obligations, membership-based obligations, and equitable duties within the Olympic and Paralympic Movement.

167. The requested relief concerns whether SafeSport and USA Water Polo may continue to maintain, recognize, enforce, publish, or give effect to disciplinary records and eligibility consequences allegedly derived from, and inseparable from, a defective

process governed by the SafeSport Code, USA Water Polo membership and participation rules, incorporated procedures, written agreements, third-party-beneficiary obligations, membership-based obligations, and equitable duties.

168. An actual controversy exists between K.M., SafeSport, and USA Water Polo concerning the legality, validity, and continuing consequences of SafeSport's reporting, investigation, temporary measures, sanctions, records, eligibility restrictions, probationary conditions, database entries, communications, and USA Water Polo's enforcement or recognition of those consequences.

169. SafeSport and USA Water Polo dispute K.M.'s position and continue to maintain, recognize, enforce, publish, rely upon, or give effect to records, positions, restrictions, eligibility consequences, or institutional narratives adverse to K.M.

170. The controversy remains ongoing because SafeSport continues to maintain or rely upon records, restrictions, probationary conditions, eligibility consequences, and institutional narratives arising from the challenged process; because SafeSport continues to contest state-court findings that, in the words of the Supplemental Order, "*the United States Center for SafeSport, Inc., intentionally withheld exculpatory evidence*," "*acted in bad faith, intentionally, and with malice*," and engaged in "*fraud, collusion, pretense, and similar wrongdoing*" that was "*clear, convincing, intentional, and beyond doubt*"; because criminal-case information, SafeSport disciplinary labels, and public-facing eligibility consequences continue to appear in public-record, data-aggregation, background-search, consumer-reporting, employment-screening, licensing, lending, housing, and education-related systems long after the criminal cases were dismissed; and because SafeSport and USA

Water Polo's recognized gatekeeping role means that continued reliance on challenged disciplinary records can function as continuing exclusion from meaningful athletic, coaching, instructional, educational, and economic opportunities, even after the criminal cases were dismissed and even after material contradictions surfaced.

171. K.M. is entitled to a declaration that, under the SafeSport Code, USA Water Polo membership and participation rules, incorporated procedures, written agreements, third-party-beneficiary obligations, membership-based obligations, and equitable duties, SafeSport and USA Water Polo owed her duties of fair notice, fair process, neutrality, good faith, reasonable investigation, non-retaliation, and nonuse of materially false, incomplete, or tainted records; that SafeSport's handling of the matter was inconsistent with those duties; that SafeSport may not rely on materially false, incomplete, or tainted records to impair K.M.'s athletic opportunities; and that USA Water Polo may not enforce, recognize, publish, or give effect to sanctions, restrictions, database entries, eligibility determinations, or records derived from the defective process alleged herein.

172. This declaration is necessary because SafeSport and USA Water Polo should not be permitted to use the SafeSport Code, membership rules, incorporated procedures, national governing body enforcement, law enforcement referral, and public facing disciplinary consequences to impose criminal, athletic, reputational, and eligibility harms while disclaiming the contractual, membership-based, third-party-beneficiary, and equitable obligations created by that same framework.

173. K.M. also seeks further relief under 28 U.S.C. § 2202, including correction, removal, limitation, retraction, nonuse, or restricted dissemination of records, notices,

publications, restrictions, database entries, probationary conditions, eligibility consequences, law enforcement-related records, national governing body communications, and other communications that rest on the defective process alleged herein.

174. This count is brought pursuant to 28 U.S.C. §§ 2201 and 2202 and arises from the continuing use and enforcement of sanctions, records, restrictions, eligibility consequences, and participation consequences imposed through SafeSport's federally recognized authority, as implemented through federal athlete-safety law, the SafeSport Code, USA Water Polo's membership rules and participation agreements, written agreements among SafeSport, the United States Olympic and Paralympic Committee, and national governing bodies, and related contractual, quasi-contractual, membership based, third party beneficiary, and equitable obligations. The continuing controversy includes Defendants' reliance on records, sanctions, restrictions, and eligibility consequences derived from a process in which SafeSport intentionally withheld exculpatory evidence and restricted access to exculpatory investigative information.

175. K.M. does not seek damages under this count. She seeks declaratory and equitable relief to determine the parties' rights and obligations under federal athlete-safety law, the SafeSport Code, USA Water Polo membership and participation rules, incorporated procedures, written agreements, third-party-beneficiary obligations, membership-based obligations, and equitable duties, and to prevent continuing reliance on defective records, sanctions, restrictions, database entries, and eligibility consequences.

**COUNT II - MALICIOUS PROSECUTION**
**Against SafeSport and Tripp**

176. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 113 concerning K.M.'s report to SafeSport, SafeSport's conversion of K.M. from claimant into suspect, the E.C. matter, the K.F. matter, the criminal proceedings, causation, background-search consequences, and foreseeable consequences; paragraphs 79 through 91 concerning SafeSport's file, withheld materials, and the criminal proceedings; and paragraphs 131 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations.

177. SafeSport and Tripp initiated, procured, continued, or materially participated in the initiation or continuation of two criminal proceedings against K.M. in Seminole County, Florida, including Case No. 2022-MM-001423 and Case No. 2022-MM-002950.

178. SafeSport and Tripp's April 2022 report to law enforcement caused or materially contributed to the first criminal proceeding. SafeSport and Tripp's later communications with K.F. caused or materially contributed to the second criminal proceeding.

179. The first criminal proceeding arose from the alleged incident on January 30, 2022, involving E.C. Before SafeSport's investigator contacted law enforcement in April 2022, no one had made a police report concerning that alleged incident.

180. SafeSport, acting through Tripp, and Tripp individually, initiated or procured the first criminal proceeding by contacting the Seminole County Sheriff's Office

on April 14 and April 15, 2022, identifying K.M. as a suspect, supplying the names of alleged victims and witnesses, representing that he was acting as a mandatory reporter, and causing law enforcement to investigate K.M. before Tripp or SafeSport had interviewed her or fairly tested the reliability of the accusation.

181. Tripp's status as a former law enforcement officer, his representation that he was acting as a mandatory reporter, and his identification of K.M. as a suspect gave the report an appearance of official reliability. As a result, law enforcement treated the matter as urgent and pursued an investigation over the Easter holiday weekend, even though the alleged E.C. incident was approximately seventy-five days old and had already been addressed by school officials without further police involvement.

182. Tripp's report falsely stated or suggested that E.C. had reported the matter to SafeSport. E.C. had not made a police report or SafeSport report between January 30, 2022, and April 14, 2022. Law enforcement contacted E.C. only after Tripp's report. Tripp knew, should have known, or recklessly failed to determine that the report was materially incomplete or misleading because K.M. had contacted SafeSport for assistance, the school investigation had closed without further action or police involvement, no police report had been made concerning the E.C. matter before Tripp's contact with law enforcement, and E.C. was contacted by law enforcement only after Tripp's report.

183. The first criminal proceeding was initiated and continued without probable cause because the underlying accusation was materially unreliable, had not been reported to law enforcement until SafeSport's intervention, was contradicted by the prior

school investigation, and was supported by statements containing material inconsistencies.

184. The second criminal proceeding arose from K.F.'s separate allegation. K.F. initially claimed that K.M. touched her on January 21, 2022. K.M. promptly provided evidence showing that she was not in K.F.'s vicinity on that date.

185. After K.M. produced that exculpatory evidence, K.F. changed the alleged date range to approximately January 14 through January 16, 2022. SafeSport then reissued or amended the allegations to conform to the changed dates.

186. On July 24, 2022, K.M. received a favorable temporary measures ruling in the SafeSport matter, allowing her to resume playing water polo.

187. After that ruling, Tripp continued to communicate with K.F. and directed or encouraged K.F. to go to local law enforcement to file charges against K.M.

188. K.F. made a police report on July 26, 2022. The report itself and related law enforcement records show that K.F. went to law enforcement at Tripp's direction or encouragement. Tripp's direction or encouragement was a legal cause of the second criminal proceeding because K.F.'s original alleged date had already collapsed, K.M. had supplied contrary evidence, SafeSport had amended or reissued allegations to conform to K.F.'s changed date range, and Tripp nevertheless directed or encouraged K.F. to place the accusation into the Florida criminal process.

189. K.F.'s report caused or materially contributed to the second criminal proceeding against K.M., even though K.F.'s account had already shifted dates, was

contradicted by evidence K.M. had provided, and was later undermined by sworn testimony.

190. At the time K.F. went to law enforcement, SafeSport knew or had reason to know that K.F.'s original date was not reliable because K.M. had already provided contrary evidence; that K.F. had changed the alleged time frame only after being confronted with that evidence; and that the accusation rested on reconstruction rather than independent recollection.

191. At the Arbitration, K.F. admitted under oath that information she provided to the Seminole County Sheriff's Office was not truthful or was materially inaccurate, including information concerning the alleged date, location, clothing, and circumstances of the incident.

192. At the Arbitration, M.K. testified under oath that her sworn statement to law enforcement was not factually correct.

193. Statements by E.C., K.F., and M.K. supplied part of the factual basis used by SafeSport, Tripp, law enforcement, prosecutors, and athletic authorities in the criminal and disciplinary processes. SafeSport and Tripp initiated, procured, continued, or materially participated in the criminal proceedings by transmitting, adopting, relying upon, encouraging, or failing to correct false, incomplete, materially misleading, or recklessly unreliable statements after facts emerged undermining their reliability.

194. Both criminal proceedings terminated in K.M.'s favor when the State entered nolle prosequi in Case No. 2022-MM-001423 and Case No. 2022-MM-002950 on June 19, 2023, and June 21, 2023.

195. The criminal proceedings were initiated and continued without probable cause because the accusations were materially inconsistent, unreliable, contradicted by available evidence, corrected only after K.M. had already been accused or charged, and infected by SafeSport's premature and materially incomplete reporting to law enforcement.

196. SafeSport's conduct also contributed to the continuation of the criminal proceedings. SafeSport communicated with prosecutors or others involved in the criminal cases, produced only portions of its investigative file, resisted production of the balance, acknowledged receipt of the criminal court's January 23, 2023 discovery order and subpoena, objected through counsel, refused compliance, and intentionally withheld exculpatory evidence and impeachment materials that would have allowed the State and K.M. to fully test the credibility of the accusations before the cases approached trial. The Supplemental Order stated that "*the court, the State, and the defendant operated in good faith, but was repeatedly blocked for over two years*," and that "*SafeSport repeatedly and knowingly interfered with the investigation*."

197. SafeSport and Tripp acted with malice and without legal justification, including by using criminal process to punish, stigmatize, exclude, retaliate against, or gain advantage over K.M. in the water polo and SafeSport context, and by continuing to rely on accusations after learning facts that materially undermined their reliability.

198. As a direct and proximate result of SafeSport's and Tripp's malicious prosecution, K.M. suffered damages, including arrest at school, criminal prosecution, repeated court appearances, legal expense, investigative expense, emotional distress,

humiliation, reputational harm, athletic consequences, educational disruption, and lost opportunities.

**COUNT III - BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**Against SafeSport and USA Water Polo**

199. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 113 through 130 concerning the SafeSport arbitration, sanctions, records, Claimant 3 allegations, and USA Water Polo's recognition or enforcement of SafeSport consequences; paragraphs 131 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations; and paragraphs 145 through 161 concerning the SafeSport Code, USA Water Polo membership rules, the contractual, membership-based, third-party-beneficiary, and equitable obligations alleged herein, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

200. Through membership, participation, SafeSport jurisdiction, USA Water Polo affiliation, the SafeSport Code, USA Water Polo membership and participation rules, SafeSport notice, investigation, sanctions, arbitration, records, and eligibility provisions, USA Water Polo rules recognizing or enforcing SafeSport restrictions, and written agreements, policies, and incorporated procedures governing SafeSport's response-and-resolution services for the Olympic and Paralympic Movement, contractual, quasi-contractual, membership-based, or third-party-beneficiary obligations existed between K.M., SafeSport, and USA Water Polo.

201. K.M. performed all conditions required of her, or performance was excused by Defendants' conduct.

202. SafeSport and USA Water Polo promised, expressly or impliedly, to administer athlete-safety, response and resolution, eligibility, and disciplinary processes in good faith, in accordance with written policies and incorporated procedures, without arbitrary treatment, with fair notice, with a meaningful opportunity to be heard, and with procedures adequate to protect athletes and participants from materially false, incomplete, unreliable, or tainted records and sanctions.

203. The discretionary authority Defendants exercised included the authority to receive reports, classify participants as claimants or respondents, issue or amend notices of allegations, investigate or decline to investigate exculpatory information, disclose or withhold investigative materials, impose temporary measures, impose sanctions, maintain disciplinary records, communicate eligibility consequences, and recognize or enforce SafeSport restrictions through USA Water Polo. Defendants were required to exercise that discretion honestly, fairly, consistently, and in good faith, and not in a manner that deprived K.M. of the benefit of the policies, rules, procedures, and membership protections governing her participation.

204. SafeSport breached those obligations by failing to conduct a competent and impartial investigation, failing to provide fair notice of shifting allegations, failing to timely disclose material information, relying on materially inconsistent statements, and imposing consequences on K.M. based on an unfair and unreliable process.

205. USA Water Polo breached those obligations by accepting, recognizing, transmitting, enforcing, or failing to correct the consequences of SafeSport's defective process; by giving effect to SafeSport sanctions, restrictions, database entries, records, or eligibility consequences after material contradictions and reliability problems emerged; and by failing to exercise its independent duties to protect K.M.'s rights as a USA Water Polo member and participant.

206. Defendants also breached the implied covenant of good faith and fair dealing by exercising discretionary authority over K.M.'s participation and reputation in a manner designed or allowed to deprive her of the benefit of the bargain.

207. As a direct and proximate result of SafeSport's and USA Water Polo's breaches, K.M. suffered loss of athletic participation, loss of competitive opportunities, reputational harm, emotional distress, legal and investigative expenses, educational disruption, and other economic and noneconomic damages.

**COUNT IV - TORTIOUS INTERFERENCE WITH BUSINESS, ATHLETIC, AND ADVANTAGEOUS RELATIONSHIPS**
**Against Scott Tripp**

208. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 79 concerning Tripp's law-enforcement reports, his communications with K.F., the E.C. matter, the K.F. matter, and the criminal proceedings; paragraphs 95 through 113 concerning causation, K.M.'s USA Water Polo participation, her UCF water polo opportunity, background-search consequences, her swimming-instruction and coaching opportunities, and the foreseeable consequences of Defendants' conduct; paragraphs 114 through 131 concerning the SafeSport process,

arbitration, sanctions, eligibility consequences, USA Water Polo's recognition or enforcement of SafeSport consequences, and continuing records; and paragraphs 145 through 161 concerning the organizational framework, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

209. In 2022 and thereafter, K.M. had identifiable existing and prospective athletic and economic relationships, including relationships with USA Water Polo, her water polo team and coaches, tournament and club water polo programs, the UCF water polo program, Seminole Aquatics, Patriot Aquatics, private swim-lesson clients, parents, students, and paid swim-instruction, water polo coaching, and athlete-development opportunities involving younger athletes.

210. Tripp knew or should have known of those relationships because he was assigned as SafeSport investigator in a matter directly involving K.M.'s eligibility, reputation, participation, and standing within organized water polo.

211. Tripp intentionally and unjustifiably interfered with those relationships by identifying K.M. as a criminal suspect before interviewing her, by falsely stating or suggesting that E.C. had reported the matter to SafeSport, and by directing or encouraging K.F. to make a police report after K.F.'s original date had collapsed and after K.M. had supplied contrary evidence.

212. Tripp's interference was independently wrongful because it was based on false or materially incomplete statements, reckless disregard of known inconsistencies,

shifting accusations, ignored exculpatory information, and misuse of SafeSport's investigative process.

213. As a direct and proximate result, K.M. lost athletic participation, impaired team and tournament opportunities, reputational standing within the water polo community, swim-instruction and coaching opportunities, and other economic and noneconomic benefits.

214. As a direct and proximate result of Tripp's interference, K.M. suffered damages, including lost athletic opportunities, impaired team and tournament participation, reputational injury within the water polo community, emotional distress, lost or impaired swim-instruction income, lost or impaired private swim-lesson income, lost or impaired coaching and athlete-development opportunities, lost or impaired relationships with parents, students, and clients, and other economic and noneconomic losses.

**COUNT V - TORTIOUS INTERFERENCE WITH BUSINESS, ATHLETIC, AND ADVANTAGEOUS RELATIONSHIPS**
**Against SafeSport**

215. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 131 concerning SafeSport's law-enforcement reports, investigation, disciplinary process, arbitration, sanctions, eligibility consequences, records, omitted or restricted exculpatory evidence, USA Water Polo's recognition or enforcement of SafeSport consequences, background-search consequences, and interference with K.M.'s athletic and economic relationships; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental

Order, and issue-preclusion allegations; and paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's role, the organizational framework, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

216. In 2022 and continuing thereafter, K.M. had existing and prospective relationships with USA Water Polo, Seminole Aquatics, Patriot Aquatics, private swim-lesson clients, parents, students, coaches, teams, tournaments, schools, athletic programs, teammates, and the broader water polo and aquatics community.

217. SafeSport knew of K.M.'s existing and prospective athletic relationships because SafeSport's authority and disciplinary process directly affected K.M.'s eligibility, participation, reputation, and standing within USA Water Polo and the broader Olympic and Paralympic Movement.

218. SafeSport knew or should have known that identifying K.M. as a criminal suspect, transmitting or maintaining accusations of battery, sexual misconduct, nonconsensual physical contact, or SafeSport Code violations, and imposing or maintaining athletic restrictions would foreseeably interfere with K.M.'s athletic participation, team relationships, tournament opportunities, coaching relationships, and future water polo opportunities.

219. SafeSport intentionally and unjustifiably interfered with K.M.'s existing and prospective relationships by making or causing materially incomplete law-enforcement reports; encouraging or directing additional criminal reporting; adopting, maintaining, transmitting, publishing, or giving effect to false or materially unreliable

accusations; producing only portions of its investigative file while intentionally withholding exculpatory evidence and materials bearing on witness credibility; restricting access to exculpatory investigative information; refusing to comply with criminal court orders and law-enforcement requests seeking relevant SafeSport materials; imposing or maintaining suspension, probationary restrictions, no-contact restrictions, training requirements, adverse records, database entries, public-facing disciplinary records, and eligibility consequences; causing USA Water Polo and others within the Olympic and Paralympic Movement to recognize, transmit, or enforce those consequences; permitting or causing those criminal-case and SafeSport-related records to persist in public-record, data-aggregation, background-search, employment-screening, licensing, lending, housing, and education-related systems; using or causing the use of SafeSport and USA Water Polo's practical gatekeeping authority to impair K.M.'s access to recognized athletic, coaching, instructional, educational, and economic opportunities; and continuing to rely on the challenged record after learning facts that materially undermined its reliability.

220. SafeSport also knew or should have known that, because USA Water Polo is the national governing body for water polo and because meaningful competitive, coaching, instructional, and athlete-development opportunities depend on recognized eligibility and reputation within that system, SafeSport's restrictions, records, database entries, and misconduct labels would foreseeably interfere with K.M.'s existing and prospective athletic, educational, coaching, instructional, and economic relationships. Those consequences were not incidental or unforeseeable. They flowed directly from

SafeSport's use of nationally recognized disciplinary labels and USA Water Polo's recognition, transmission, or enforcement of those labels within a system where athletes, teams, clubs, schools, parents, employers, and other opportunity gatekeepers rely on eligibility status, reputation, and disciplinary history.

221. SafeSport's interference was not privileged or justified because it was based on bad faith, reckless disregard, false or materially incomplete statements, shifting accusations, withheld or delayed materials, and process misuse.

222. As a direct and proximate result of SafeSport's interference, K.M. suffered damages, including lost athletic opportunities, impaired team and tournament participation, reputational injury within the water polo community, emotional distress, lost full-time swim-instruction income from Seminole Aquatics, lost private swim-lesson income, lost or impaired Patriot Aquatics coaching opportunities, lost or impaired relationships with parents, students, and clients, and other economic and noneconomic losses.

**COUNT VI - VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Against SafeSport and USA Water Polo**

223. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 131 concerning SafeSport's investigation, records, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA Water Polo recognition or enforcement, background-search consequences, and continuing interference with K.M.'s athletic and economic opportunities; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental Order, and issue-

preclusion allegations; and paragraphs 145 through 161 concerning the organizational framework, membership rules, participation rules, SafeSport response-and-resolution services, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

224. SafeSport and USA Water Polo were engaged in trade or commerce by offering, administering, recognizing, enforcing, or providing membership, participation, eligibility, athlete-safety, response-and-resolution, training, event, competition, and related services affecting Florida athletes and participants, including K.M.

225. K.M. and her family were consumers, participants, members, intended beneficiaries, or aggrieved persons within that system because, on information and belief, K.M. or her family paid for, purchased, or provided consideration for USA Water Polo membership, participation, event access, training, competition, club participation, eligibility, athlete-safety protections, reporting rights, disciplinary rights, and related services governed by SafeSport and USA Water Polo policies, rules, procedures, and services. K.M.'s access to those paid or economically supported services, benefits, participation opportunities, and eligibility rights was directly affected by SafeSport's records, sanctions, restrictions, database entries, and USA Water Polo's recognition or enforcement of those consequences.

226. SafeSport and USA Water Polo engaged in unfair or deceptive acts or practices by holding out the SafeSport system as an athlete-safety, reporting, investigation, response, resolution, and eligibility system while, as applied to K.M., converting a claimant into a respondent and criminal suspect before fairly testing her

report; causing or materially contributing to criminal reporting; relying on materially false or unreliable accusations; intentionally withholding exculpatory evidence; restricting access to exculpatory investigative information; opening or maintaining additional proceedings after material contradictions surfaced; continuing to maintain, transmit, publish, recognize, or enforce records, restrictions, sanctions, and eligibility consequences derived from the defective process; using or permitting the practical gatekeeping power of SafeSport and USA Water Polo to impair K.M.'s access to recognized athletic, coaching, instructional, educational, reputation-dependent, and economic opportunities; and creating or maintaining conditions under which criminal-case information and SafeSport disciplinary labels could continue appearing in public-record, data-aggregation, background-search, employment-screening, licensing, lending, housing, and education-related systems after the criminal cases were dismissed.

227. Those practices were unfair because they offended established public policy, were immoral, unethical, oppressive, unscrupulous, or substantially injurious, and caused K.M. to suffer athletic, educational, economic, reputational, and participation-related harm. They were especially unfair because SafeSport and USA Water Polo exercised practical gatekeeping authority over recognized participation and opportunity while denying K.M. a fair, reliable, and complete process before allowing tainted records, sanctions, restrictions, eligibility consequences, and disciplinary labels to impair her future opportunities.

228. Those practices were deceptive because they were likely to mislead athletes, participants, members, parents, coaches, clubs, schools, and national governing body

participants acting reasonably under the circumstances concerning the fairness, reliability, neutrality, completeness, and integrity of SafeSport's reporting, investigation, response, resolution, records, and eligibility processes.

229. As a direct and proximate result, K.M. suffered actual damages, including lost economic opportunities, lost coaching and instructional opportunities, lost or impaired participation opportunities, lost or impaired access to recognized athletic and athlete-development pathways, legal and investigative expenses connected to the defective process, costs and burdens associated with monitoring, explaining, correcting, challenging, or mitigating public-record and background-search consequences, and other economic losses recoverable under FDUTPA.

230. K.M. also seeks declaratory and injunctive relief requiring SafeSport and USA Water Polo to cease relying upon, transmitting, publishing, recognizing, or enforcing records, sanctions, restrictions, eligibility consequences, database entries, public-facing disciplinary records, or institutional communications derived from the unfair or deceptive practices alleged herein.

**COUNT VII - DECLARATORY AND EQUITABLE RELIEF UNDER ARTICLE I, SECTIONS 9 AND 23 OF THE FLORIDA CONSTITUTION, AS APPLIED**
**Against SafeSport and USA Water Polo**

231. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 79 concerning SafeSport's law-enforcement reporting and K.M.'s conversion from claimant into criminal suspect; paragraphs 80 through 92 concerning communications with prosecutors, resistance to criminal-court and law-enforcement requests, and intentional withholding of

exculpatory evidence; paragraphs 132 through 144 concerning the Supplemental Order and issue-preclusion allegations; and paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's recognition or enforcement, the as-applied state-action allegations, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences.

232. Article I, section 9 of the Florida Constitution protects due process. Article I, section 23, protects the right of privacy from governmental intrusion.

233. SafeSport and USA Water Polo acted as state actors, acted jointly with state actors, or exercised authority fairly attributable to the State of Florida as applied here. SafeSport and USA Water Polo are not being sued merely for their internal membership determinations. Rather, they are being sued for their affirmative actions that crossed into and directly influenced the Florida criminal justice system. In *Navarro v. United States Center for SafeSport*, the Fourth Circuit held that SafeSport's adjudication of membership and participation rights in amateur athletics does not constitute state action. That holding is inapposite here because the present case does not challenge SafeSport's internal membership determinations.

234. It challenges SafeSport's conduct in initiating, directing, and influencing Florida criminal proceedings, a function that is traditionally and exclusively governmental—through purposeful contact with Florida law enforcement, material misrepresentations to police, and direction of a Florida witness to file criminal charges. SafeSport's role here was not merely to report; it was to investigate, influence, and direct

the course of a criminal prosecution. SafeSport did not merely receive information and make a passive report.

235. SafeSport, through Tripp, affirmatively contacted Florida law enforcement, identified K.M. as a criminal suspect, supplied names of alleged victims and witnesses, caused or materially contributed to law-enforcement contact with E.C., directed or encouraged K.F. to make a Florida police report after K.M. produced contrary evidence, produced only portions of its investigative file to the prosecution, resisted Florida criminal-discovery orders and subpoenas, refused or failed to comply with Florida law-enforcement requests, and continued to maintain or enforce records and sanctions after material contradictions surfaced. USA Water Polo then recognized, transmitted, enforced, or gave effect to SafeSport's restrictions, records, database entries, eligibility consequences, or participation consequences within the national-governing-body structure.

236. As applied here, those acts created a close nexus, joint participation, or entwinement between Defendants' conduct and Florida criminal process, Florida law enforcement, Florida court orders, and Florida-based deprivation of K.M.'s fair-process, privacy, reputation, participation, eligibility, and economic interests. The nature of this nexus is not mere approval, acquiescence, or passive reporting. Rather, SafeSport affirmatively and materially influenced the criminal process through conduct that went far beyond the private adjudication of membership rights.

237. Specifically, SafeSport, acting through Tripp, (a) contacted Florida law enforcement and identified K.M. as a criminal suspect before interviewing her or testing

her account; (b) falsely stated or suggested that E.C. had reported the matter to SafeSport, thereby creating a misleading predicate for law enforcement action; (c) provided names of purported victims and witnesses, directing the scope of the investigation; (d) after K.M. provided evidence undermining K.F.'s original allegation, directed or encouraged K.F. to file a police report; (e) selectively produced investigative materials to the prosecution while intentionally withholding exculpatory evidence and impeachment information; (f) acknowledged criminal court orders and subpoenas but refused to comply; (g) refused to respond to law enforcement requests for the same materials; and (h) continued to maintain and enforce sanctions and records derived from the same tainted investigation. This course of conduct demonstrates that SafeSport was not merely a private actor invoking state procedures; it was an active participant in and director of the criminal process.

238. As applied to K.M., SafeSport and USA Water Polo deprived K.M. of fair process, privacy, reputation, participation, eligibility, and economic opportunity by converting her from claimant into criminal suspect, causing or materially contributing to criminal process, intentionally withholding exculpatory evidence, restricting access to exculpatory investigative information, maintaining defective records and sanctions, causing or permitting those records and sanctions to be recognized or enforced after material contradictions surfaced, using nationally recognized disciplinary labels and eligibility consequences in a gatekeeping system where teams, clubs, schools, parents, employers, licensing bodies, and other opportunity gatekeepers may rely on those labels, and creating foreseeable long-term consequences in public-record, data-aggregation,

background-search, employment-screening, licensing, lending, housing, and education-related systems.

239. The deprivation here is not merely a private organization's decision about membership or participation. It is the deprivation of liberty and property interests through government-compelled or government-directed action. The Supreme Court has recognized that when a private actor exercises powers "*traditionally and exclusively*" reserved to the government, it is subject to constitutional constraints. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974). The initiation and direction of criminal investigation and prosecution is precisely such a power.

240. The criminal court itself recognized the constitutional dimension of SafeSport's conduct. The Supplemental Order stated that "*The United States Center for SafeSport, Inc., violated defendant's constitutional right to due process, intentionally withholding exculpatory evidence from the court, the State's Attorney, and the defendant," and further stated that "Suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See Brady v. Maryland*, 373 U.S. 83, 87 (1963); Floyd v. State, 902 So. 2d 775, 777-778 (Fla. 2005).

241. This is a challenge to SafeSport's conduct as a joint participant in state action, not to its internal membership determinations. The Fourth Circuit's holding in *Navarro* does not control here. In *Navarro*, trainers challenged SafeSport's procedures for barring them from Olympic sports, a purely internal membership decision that affected only participation in private athletic events.

242. Here, SafeSport's conduct (a) initiated and directed a criminal investigation, (b) made material misrepresentations to law enforcement, (c) directed a witness to file criminal charges, (d) intentionally withheld exculpatory evidence from criminal proceedings, (e) refused to comply with criminal court orders and subpoenas, and (f) continued enforcing consequences after the criminal court found bad faith and intentional misconduct. The Supreme Court has recognized that "the principles of state action require that the deprivation be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

243. The State of Florida, through its criminal court, did not merely acquiesce in SafeSport's conduct; it actively sought to obtain exculpatory evidence from SafeSport and, when SafeSport refused, found that SafeSport had violated K.M.'s constitutional right to due process. This is not the "*private action*" contemplated by *Navarro*. It is precisely the type of "joint participation" that renders a private actor subject to constitutional constraints. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296-97 (2001) (private association's "action is fairly attributable to the state" when there is "pervasive entwinement" with the state).

244. K.M. seeks declaratory and equitable relief only under this count, including correction, removal, limitation, retraction, nonuse, or restricted dissemination of records, sanctions, restrictions, database entries, eligibility consequences, public-facing disciplinary records, law-enforcement-related records, national-governing-body

communications, and USA Water Polo communications or enforcement records derived from the defective process alleged herein.

**COUNT VIII - INJURIOUS FALSEHOOD / TRADE LIBEL / DISPARAGEMENT, AND, IN THE ALTERNATIVE, DEFAMATION BASED ONLY ON TIMELY PUBLICATIONS OR REPUBLICATIONS**
**Against SafeSport**

245. K.M. incorporates paragraphs 1 through 27 concerning the parties, jurisdiction, and venue; paragraphs 28 through 131 concerning SafeSport's investigation, law-enforcement reporting, records, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA Water Polo recognition or enforcement, background-search consequences, and continuing interference with K.M.'s athletic and economic opportunities; paragraphs 132 through 144 concerning the Supplemental Order and issue-preclusion allegations; and paragraphs 145 through 161 concerning the organizational framework, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, the foreseeable consequences of SafeSport disciplinary labels, and the commercial effect of SafeSport and USA Water Polo eligibility consequences. This count is timely to the extent it seeks damages for injuries occurring within the applicable limitations period. Any injurious falsehood, trade libel, disparagement, or defamation claim is brought only as to publications, transmissions, database entries, records, statements, labels, or communications that occurred, were renewed, were maintained, were transmitted, or were caused to be transmitted within the applicable limitations period. K.M. does not seek to revive any time-barred claim based solely on an original publication outside the applicable limitations period. To the

extent any earlier publication falls outside the limitations period, K.M. relies on those earlier publications only as background, context, evidence of falsity, evidence of malice, evidence of causation, evidence of damages, evidence of continuing reliance, and evidence supporting her separate or alternative claims for injurious falsehood, trade libel, disparagement, tortious interference, FDUTPA relief, declaratory relief, equitable relief, and punitive damages.

246. This count is pleaded primarily as a claim for injurious falsehood, trade libel, disparagement, and economic injury caused by false or materially misleading statements, labels, records, database entries, disciplinary descriptors, and communications concerning K.M. Under Florida law, defamation claims are subject to a two-year statute of limitations that runs from the date of first publication, and there is no discovery rule for defamation. See Fla. Stat. § 95.11(4)(g); *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113 (Fla. 1993); *Ashraf v. Adventist Health System/Sunbelt, Inc.*, 200 So. 3d 173 (Fla. 5th DCA 2016).

247. Florida follows the single publication rule, meaning that the continued availability of a publication on the internet does not create a new claim or restart the limitations period. See Fla. Stat. §§ 770.05-07; *Swedberg v. Goldfinger's South, Inc.*, 338 So. 3d 332 (Fla. 3d DCA 2022). A republication that restarts the statute of limitations requires a separate, conscious decision to disseminate the material, often with new or materially different content. See *Ovadia v. Bloom*, 756 So. 2d 137, 139-41 (Fla. 3d DCA 2000).

248. Accordingly, K.M. pleads defamation only in the alternative and only as to publications, republications, updates, transmissions, database entries, records,

statements, labels, or communications made, renewed, maintained, transmitted, or caused to be transmitted within the applicable limitations period. This includes, but is not limited to, SafeSport's continued maintenance and transmission of disciplinary labels and records through its public database, which constitutes a separate, conscious decision to disseminate the challenged information to third parties with ongoing practical consequences.

249. In the alternative, and only to the extent the Court determines that the challenged conduct constitutes defamation rather than injurious falsehood, trade libel, or disparagement, K.M. alleges that SafeSport defamed her through **timely publications and republications** that occurred within the applicable two-year limitations period. The original publications in 2022 are outside the limitations period. However, SafeSport's **continued maintenance of its publicly accessible database listing K.M. as "Temporary Suspension," "Suspension," "Ineligible," "Physical Misconduct," and "Sexual Misconduct,"** which SafeSport is required by federal statute to "*publish and maintain*," constitutes a separate, conscious decision to disseminate the challenged labels and records with ongoing practical consequences. *See* 36 U.S.C. § 220541(a)(1)(G).

250. Each time a third-party accesses, views, or relies upon SafeSport's public database or when SafeSport transmits, updates, or maintains those records, SafeSport has made a conscious decision to continue publishing the challenged labels and statements. Additionally, SafeSport's transmission of disciplinary records and eligibility consequences to USA Water Polo and other entities within the Olympic and Paralympic Movement constitutes separate republications. On information and belief, these

transmissions and database entries have continued within the limitations period, as the background-search report alleged herein demonstrates.

251. K.M. does not seek to revive any time-barred libel or slander claim based solely on an original publication outside the applicable limitations period.

252. To the extent any earlier publication falls outside the limitations period for libel or slander, K.M. relies on those earlier publications only as background, context, evidence of falsity, evidence of malice, evidence of causation, evidence of damages, evidence of continuing reliance, and evidence supporting her separate or alternative claims for injurious falsehood, trade libel, disparagement, tortious interference, FDUTPA relief, declaratory relief, equitable relief, and punitive damages.

253. SafeSport published, transmitted, maintained, caused to be published, caused to be transmitted, or gave continuing effect to false or materially misleading statements of fact concerning K.M., including statements, labels, records, database entries, disciplinary descriptors, communications, or eligibility consequences stating or implying that K.M. committed battery, engaged in physical misconduct, engaged in sexual misconduct, was properly subject to a criminal disposition, was properly suspended, was properly deemed ineligible, was properly subject to temporary suspension, or was otherwise properly found responsible for misconduct.

254. Those statements and labels were false or materially misleading when made or became false or materially misleading when SafeSport continued to maintain, transmit, publish, republish, recognize, enforce, or give effect to them after material contradictions surfaced. The criminal cases against K.M. were dismissed by nolle

prosequi. The Supplemental Order found that SafeSport intentionally withheld exculpatory evidence, acted in bad faith, intentionally, and with malice, and the facts alleged herein show that the accusations, disciplinary labels, records, and continuing eligibility consequences were based on materially incomplete, unreliable, contradicted, or tainted information.

255. SafeSport's statements and labels were not merely opinions, predictions, internal commentary, or nonactionable characterizations. They communicated or reasonably implied objectively verifiable facts about K.M., including that K.M. had committed misconduct, that K.M. had been properly disciplined for misconduct, that K.M. was ineligible or suspended for valid reasons, that K.M. was associated with criminal disposition, physical misconduct, or sexual misconduct, and that K.M.'s continued exclusion or restriction was justified.

256. SafeSport knew or reasonably should have known that those statements, labels, records, database entries, disciplinary descriptors, and eligibility consequences would likely induce third parties not to deal with K.M., not to select K.M., not to hire K.M., not to retain K.M., not to allow K.M. to coach or instruct, not to allow K.M. to participate, not to extend opportunities to K.M., or to condition opportunities on the existence of those records or labels.

257. The third parties likely to be affected included USA Water Polo, clubs, teams, schools, coaches, parents, tournament organizers, athlete-development programs, employers, licensing-related decisionmakers, background-search users, reputation-screening users, educational programs, and others who rely on SafeSport status, criminal-

case information, misconduct labels, eligibility status, or public-facing disciplinary information when deciding whether to deal with, hire, retain, select, permit, sponsor, house, credential, coach, instruct, supervise, or associate with an athlete or participant.

258. SafeSport published or communicated the challenged statements and labels to third parties, including USA Water Polo, persons and entities within the Olympic and Paralympic Movement, persons or entities with access to SafeSport disciplinary information, law-enforcement or prosecution-related recipients, and, on information and belief, public-record, data-aggregation, background-search, or reputation-screening systems that collect, reproduce, summarize, categorize, or display criminal-case and SafeSport-related information.

259. The foreseeable dissemination and republication of those statements and labels is not speculative. A September 3, 2026, background-search report for K.M. reflects that public-record and background-search systems can still associate her name with dismissed Seminole County misdemeanor battery cases, including Case Nos. 2022-MM-001423 and 2022-MM-002950, even though both cases are listed as *nolle prosequi*. The same report displays SafeSport-related or disciplinary descriptors and statuses including "*Temporary Suspension*," "*Suspension*," "*Ineligible*," "*Physical Misconduct*," "Sex*ual Misconduct*," "*Criminal Disposition*," and "*Allegations of Misconduct*."

260. SafeSport cannot avoid liability by arguing that its initial 2022 publications are time-barred because it has continued to publish, maintain, and transmit the challenged labels and records. The single publication rule does not shield a defendant who "has *published a new edition of a book, even though it is unchanged from the original*

*version,*" because the new edition is a "*separate republication*." *See Doe v. Finkelman*, No. 3D19-2345, 2021 WL 4734142, at *3 (Fla. 3d DCA Oct. 13, 2021) (recognizing republication where each episode of a docuseries had distinct content and was separately disseminated).

261. Here, SafeSport's continued maintenance of its public database and its repeated transmissions of eligibility consequences to USA Water Polo and other entities are analogous to separate editions or episodes, they are separate, conscious decisions to disseminate the same material on an ongoing basis. SafeSport's statutory obligation to maintain a public database does not immunize it from liability for the ongoing harm caused by the continued dissemination of false and misleading disciplinary labels. The two-year statute of limitations for defamation therefore does not bar claims based on these timely republications. *See* § 95.11(4)(g), Fla. Stat.; *see also* CS/SB 752 (2025) (recognizing that continued website presence after notice constitutes a "*new publication*" for statute of limitations purposes).

262. K.M. does not allege that the September 3, 2026, Intelius report is itself a consumer report under the Fair Credit Reporting Act or that the Intelius report may lawfully be used to determine employment, credit, loans, education, housing, licensing, or other FCRA-regulated eligibility. Rather, K.M. alleges that the report illustrates that SafeSport-related labels and dismissed criminal-case information have entered public-record, data-aggregation, and background-search systems, where they can continue to be reproduced, summarized, categorized, and displayed after the criminal cases were dismissed.

263. K.M. also alleges that SafeSport's conduct constitutes injurious falsehood, trade libel, and disparagement, which are separate causes of action governed by a two-year statute of limitations under Florida law. *See* § 95.11(4)(g), Fla. Stat.; *Old Plantation Corp. v. Maule Indus. Inc.*, 68 So. 2d 180 (Fla. 1953). The injurious falsehood claim is the primary claim in this count because it addresses the economic injury caused by SafeSport's false statements disparaging K.M.'s business and professional opportunities. Unlike defamation, injurious falsehood protects against statements that disparage a plaintiff's "intangible things" including business and professional interests. *See Lehman v. Lucom*, 181 So. 2d 242, 244-45 (Fla. 3d DCA 1965); *see also Kanarick v. Amazon.com, Inc.*, No. 21-23926-CIV, 2022 WL 17830334, at *3 (S.D. Fla. Dec. 20, 2022) (discussing elements of injurious falsehood). The injurious falsehood claim is not subject to the same single publication rule limitations because it seeks damages for the ongoing economic harm caused by SafeSport's continued publication and maintenance of the challenged statements, labels, and records.

264. SafeSport's statements, labels, records, database entries, disciplinary descriptors, and eligibility consequences played a material and substantial part in causing third parties to avoid, restrict, deny, impair, or fail to offer athletic, coaching, instructional, educational, employment, licensing, reputation-dependent, or economic opportunities to K.M. Those effects were the natural and foreseeable result of placing or maintaining misconduct labels, criminal-disposition labels, suspension labels, ineligibility labels, and tainted disciplinary records within the SafeSport and national-governing-body ecosystem.

265. K.M. suffered special damages and pecuniary losses as a direct and proximate result of SafeSport's false or materially misleading statements, labels, records, database entries, disciplinary descriptors, and eligibility consequences. Those damages include lost coaching or instructional income, lost or impaired economic opportunities, lost or impaired athlete-development opportunities with economic value, expenses incurred to investigate, correct, mitigate, explain, challenge, or limit dissemination of the challenged information, costs associated with background-search consequences, and other realized economic losses to be proven at trial.

266. K.M. further suffered reputational injury, humiliation, emotional distress, impairment of athletic opportunities, impairment of educational opportunities, impairment of coaching and instructional opportunities, impairment of reputation-dependent opportunities, and continuing harm from the circulation, maintenance, transmission, or recognition of false or materially misleading records and labels.

267. SafeSport acted with knowledge of falsity, reckless disregard for the truth, actual malice, common-law malice, bad faith, or at least negligence. SafeSport knew or should have known that the challenged statements, labels, records, and communications were false or materially misleading because SafeSport possessed or controlled exculpatory evidence, prior witness statements, impeachment materials, contradictory information, and investigative materials undermining the accusations, and because the Supplemental Order found that SafeSport intentionally withheld exculpatory evidence and acted in bad faith, intentionally, and with malice.

268. To the extent SafeSport claims privilege, statutory immunity, reporting immunity, common-interest privilege, litigation privilege, fair-report protection, truth, substantial truth, or any other defense, those protections are defeated, limited, inapplicable, or unavailable because SafeSport acted with actual malice, bad faith, reckless disregard, intentional misconduct, improper purpose, knowledge of material contradictions, and continued reliance on challenged statements and labels after learning facts that materially undermined their truth and reliability.

269. In the alternative, and only as to timely publications, republications, updates, transmissions, database entries, records, statements, labels, or communications within the applicable limitations period, SafeSport defamed K.M. by publishing or causing publication of false or materially misleading statements of fact stating or implying that K.M. committed criminal, physical, or sexual misconduct, was properly subject to criminal disposition, was properly suspended, was properly deemed ineligible, or was properly found responsible for misconduct.

270. The defamatory meaning of those statements and labels is apparent on their face or, alternatively, apparent from the surrounding circumstances. Statements or labels identifying K.M. with battery, sexual misconduct, physical misconduct, suspension, ineligibility, criminal disposition, or misconduct allegations tend to subject K.M. to distrust, contempt, disgrace, avoidance, and reputational harm, and tend to injure her in athletic, coaching, instructional, educational, employment, licensing, and reputation-dependent opportunities.

271. The alternative defamation claim is limited to timely publications or republications and does not rely on any untimely original publication as an independent basis for defamation damages. K.M. pleads earlier publications only as background, context, evidence of falsity, evidence of malice, evidence of causation, and evidence of damages, and pleads injurious falsehood, trade libel, disparagement, tortious interference, FDUTPA, declaratory relief, and equitable relief as separate or alternative theories.

272. As a direct and proximate result of the conduct alleged in this count, K.M. suffered damages, including special damages, pecuniary losses, reputational harm, emotional distress, humiliation, lost opportunities, lost economic opportunities, mitigation expenses, costs associated with investigation and correction, and other damages recoverable under Florida law.

273. K.M. seeks compensatory damages, special damages, presumed damages where permitted, punitive damages where permitted, declaratory relief, injunctive relief, correction, retraction, removal, restricted dissemination, nonuse of false or materially misleading labels, and all other relief permitted by law.

**COUNT IX - DECLARATORY RELIEF CONCERNING PUBLICATION, DATABASE USE, AND CONTINUING EFFECT OF ALLEGATIONS**
**Against SafeSport and USA Water Polo**

274. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 28 through 131 concerning SafeSport's investigation, law-enforcement reporting, disciplinary process, arbitration, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA

Water Polo's recognition or enforcement of SafeSport consequences, background-search consequences, and continuing interference with K.M.'s athletic and economic relationships; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations; paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's role, the organizational framework, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; and paragraphs 234 through 254 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, economic injury, and the need for correction, retraction, removal, restricted dissemination, and nonuse of false or materially misleading labels.

275. An actual, present, and continuing controversy exists concerning whether SafeSport and USA Water Polo may continue to publish, transmit, maintain, recognize, enforce, rely upon, or give gatekeeping effect to allegations, restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, background-search consequences, or participation consequences concerning K.M. that arise from or depend upon the defective process alleged herein.

276. The controversy is not abstract or hypothetical. SafeSport's disciplinary labels, eligibility determinations, restrictions, sanctions, records, and database entries are designed to have continuing practical consequences within the Olympic and Paralympic Movement and within USA Water Polo-affiliated programs. USA Water Polo's

recognition, transmission, enforcement, or continued reliance on those labels, records, restrictions, sanctions, database entries, and eligibility consequences gives those records practical force beyond SafeSport's internal files.

277. As applied to K.M., those records, labels, and eligibility consequences have continuing consequences for athletic participation, water polo eligibility, coaching, instruction, private swim lessons, employment-related opportunities, educational opportunities, reputation, background-search results, public-facing records, institutional communications, and practical access to USA Water Polo-affiliated opportunities.

278. SafeSport and USA Water Polo have continued, or on information and belief may continue, to maintain, transmit, publish, recognize, enforce, rely upon, or give effect to allegations, restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or background-search consequences concerning K.M. despite material contradictions in the underlying evidence, dismissal of the criminal cases, and the findings made in the Supplemental Order.

279. K.M. does not seek a declaration that SafeSport, USA Water Polo, or any national governing body may never maintain accurate athlete-safety records, impose lawful eligibility measures, or enforce reliable and fairly supported restrictions. K.M. seeks relief only as to materially false, incomplete, tainted, unreliable, misleading, or unsupported allegations, labels, restrictions, sanctions, database entries, records, eligibility consequences, institutional communications, public-facing records, and participation consequences concerning her.

280. SafeSport and USA Water Polo's continued publication, transmission, recognition, enforcement, reliance upon, or gatekeeping use of tainted allegations, disciplinary labels, database entries, sanctions, eligibility consequences, institutional communications, and public-facing records creates continuing injury that cannot be fully remedied by damages alone. Those continuing effects impair K.M.'s reputation, athletic standing, coaching and instruction opportunities, private swim-lesson opportunities, relationships with parents and students, educational and athlete-development opportunities, and practical access to USA Water Polo-affiliated opportunities.

281. Declaratory relief is necessary because Defendants' continuing use of tainted records and labels places K.M. in the position of having to repeatedly explain, challenge, correct, or mitigate allegations and disciplinary consequences that were created through the defective process alleged herein. Without declaratory relief, Defendants may continue giving practical force to the same tainted allegations, restrictions, labels, records, database entries, and eligibility consequences even after the criminal cases were dismissed and after the Supplemental Order found serious misconduct in the handling and withholding of exculpatory evidence.

282. Injunctive relief is also necessary because Defendants' continued publication, transmission, recognition, enforcement, reliance upon, or gatekeeping use of materially false, incomplete, tainted, unreliable, or misleading records and labels threatens continuing irreparable harm to K.M.'s reputation, athletic opportunities, paid coaching and instruction opportunities, private swim-lesson opportunities, and future educational or employment-related opportunities.

283. K.M. is entitled to a declaration under 28 U.S.C. § 2201 that SafeSport and USA Water Polo may not continue to publish, transmit, maintain, recognize, enforce, rely upon, or give gatekeeping effect to materially false, incomplete, tainted, unreliable, or misleading allegations, restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, background-search consequences, or participation consequences concerning K.M.

284. K.M. is further entitled to necessary or proper relief under 28 U.S.C. § 2202, including correction, removal, retraction, restricted dissemination, nonuse, nonrecognition, nonenforcement, notice to affected entities, and any other equitable relief necessary to prevent continuing reliance on materially false, incomplete, tainted, unreliable, or misleading records, labels, restrictions, sanctions, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences concerning K.M.

285. K.M. does not seek damages under this count. K.M. seeks declaratory relief, injunctive relief, further necessary or proper relief under 28 U.S.C. § 2202, costs, attorneys' fees where available, and all other non-damages relief permitted by law.

## COUNT X - ULTRA VIRES / EXCEEDING STATUTORY AUTHORITY, IN THE ALTERNATIVE
### Against SafeSport and USA Water Polo

286. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 28 through 131 concerning SafeSport's investigation, law-enforcement reporting, disciplinary process, arbitration, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA

Water Polo's recognition or enforcement of SafeSport consequences, background-search consequences, and continuing interference with K.M.'s athletic and economic relationships; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations; paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's role, the organizational framework, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 234 through 254 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, economic injury, and the need for correction, retraction, removal, restricted dissemination, and nonuse of false or materially misleading labels; and paragraphs 255 through 266 concerning the continuing controversy over publication, database use, disciplinary labels, and continuing effect of tainted allegations.

287. This count is pleaded in the alternative. To the extent SafeSport and USA Water Polo contend that federal athlete-safety law, the SafeSport Code, USA Water Polo membership rules, incorporated procedures, or national-governing-body obligations authorized their conduct, K.M. alleges that Defendants exceeded any such authority as applied to her.

288. SafeSport's federally recognized authority is limited to lawful athlete-safety, response, resolution, investigation, eligibility, and disciplinary functions. That authority does not authorize SafeSport to convert a claimant into a criminal suspect before fairly testing her report, materially contribute to Florida criminal process through

incomplete or misleading information, withhold exculpatory evidence from a criminal court, resist criminal-court orders and law-enforcement requests, or continue giving effect to tainted records and labels after material contradictions surfaced.

289. SafeSport exceeded its lawful authority by using its athlete-safety and disciplinary framework in a manner that crossed from internal response and resolution into criminal-process contamination. SafeSport, through Tripp, reported K.M. to Florida law enforcement before interviewing her, before fairly testing her account, before reconciling the prior school investigation that closed without police involvement, and before providing K.M. a meaningful opportunity to respond.

290. SafeSport further exceeded its lawful authority by causing or materially contributing to additional criminal reporting after K.M. had provided evidence undermining K.F.'s original date, after the allegation shifted, and after K.M. obtained favorable temporary-measures relief allowing her to resume water polo participation.

291. SafeSport further exceeded its lawful authority by producing only portions of its investigative file, withholding exculpatory evidence and impeachment material, resisting or refusing compliance with criminal-court orders and subpoenas, refusing or failing to respond to law-enforcement requests, and maintaining or relying upon sanctions, restrictions, labels, database entries, and eligibility consequences derived from the same defective process.

292. USA Water Polo exceeded its lawful authority, or acted beyond the permissible scope of any national-governing-body enforcement obligation, by recognizing, transmitting, enforcing, relying upon, or giving practical effect to SafeSport

restrictions, sanctions, labels, records, database entries, and eligibility consequences that were derived from a materially incomplete, unreliable, contradicted, or tainted process.

293. USA Water Polo's obligations to recognize or enforce SafeSport consequences did not authorize it to ignore material contradictions, criminal-case dismissals, findings of intentional withholding of exculpatory evidence, findings of bad faith and malice, or the continuing use of tainted disciplinary labels and eligibility consequences that impaired K.M.'s athletic, coaching, instructional, educational, reputational, and economic opportunities.

294. Defendants' conduct was ultra vires because it exceeded the scope of any authority conferred by federal athlete-safety law, the SafeSport Code, USA Water Polo membership or participation rules, incorporated procedures, written agreements, national-governing-body obligations, or equitable principles. No lawful authority permitted Defendants to use an athlete-safety system to place materially incomplete or unreliable accusations into criminal process, withhold exculpatory information from criminal proceedings, and then continue giving gatekeeping effect to records and labels derived from that defective process.

295. Defendants' conduct also exceeded lawful authority because any authority to impose, recognize, or enforce eligibility consequences must be exercised consistently with fair notice, fair process, good faith, reasonable investigation, non-retaliation, and nonuse of materially false, incomplete, tainted, or unreliable records. Defendants had no lawful authority to impose or give continuing effect to sanctions, restrictions, database

entries, disciplinary labels, eligibility consequences, or participation consequences after learning facts that materially undermined their reliability.

296. K.M. does not allege under this count that every SafeSport report, investigation, eligibility decision, or national-governing-body enforcement action is ultra vires. K.M. alleges that Defendants acted ultra vires as applied here because they used an athlete-safety and eligibility system to create, maintain, recognize, enforce, publish, or give practical effect to tainted allegations, records, labels, restrictions, sanctions, database entries, and eligibility consequences after material contradictions, criminal-case dismissals, and judicial findings of misconduct surfaced.

297. An actual controversy exists because Defendants continue, or on information and belief may continue, to maintain, recognize, enforce, rely upon, publish, transmit, or give gatekeeping effect to records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences that K.M. contends were imposed or maintained beyond Defendants' lawful authority.

298. K.M. is entitled to a declaration that Defendants exceeded their lawful authority as applied to K.M. by creating, maintaining, recognizing, enforcing, publishing, transmitting, or giving gatekeeping effect to materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences concerning K.M.

299. K.M. is further entitled to necessary or proper relief under 28 U.S.C. § 2202, including correction, removal, retraction, restricted dissemination, nonuse, nonrecognition, nonenforcement, notice to affected entities, and other equitable relief necessary to prevent Defendants from continuing to rely upon or give effect to actions taken beyond their lawful authority.

300. K.M. does not seek damages under this count. K.M. seeks declaratory relief, injunctive relief, further necessary or proper relief under 28 U.S.C. § 2202, costs, attorneys' fees where available, and all other non-damages relief permitted by law.

**COUNT XI - VIOLATION OF FEDERAL PROCEDURAL DUE PROCESS, IN THE ALTERNATIVE**
**Against SafeSport and USA Water Polo**

301. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 28 through 131 concerning SafeSport's investigation, law-enforcement reporting, disciplinary process, arbitration, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA Water Polo's recognition or enforcement of SafeSport consequences, background-search consequences, and continuing interference with K.M.'s athletic and economic relationships; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations; paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's role, the organizational framework, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 234 through 254 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors,

eligibility consequences, special damages, economic injury, and the need for correction, retraction, removal, restricted dissemination, and nonuse of false or materially misleading labels; paragraphs 255 through 266 concerning publication, database use, disciplinary labels, and the continuing effect of tainted allegations; and paragraphs 267 through 281 concerning Defendants' ultra vires conduct and exceeding statutory authority.

302. This count is pleaded in the alternative. To the extent Defendants contend that their actions were authorized by federal athlete-safety law, the SafeSport Code, USA Water Polo membership rules, incorporated procedures, or national-governing-body obligations, K.M. alleges that Defendants' actions were nevertheless subject to federal due-process limitations as applied to her.

303. SafeSport acted as a federal actor, acted jointly with governmental actors, exercised federally delegated governmental power, or exercised authority fairly attributable to the federal government as applied to K.M. SafeSport was not merely a passive private association making an internal membership decision. SafeSport exercised congressionally recognized authority within the Olympic and Paralympic Movement, controlled or substantially influenced K.M.'s ability to participate in water polo, initiated or materially contributed to criminal investigation in Florida, maintained investigative materials bearing on K.M.'s criminal defense, resisted criminal-court and law-enforcement requests for those materials, and maintained or caused recognition of disciplinary labels and eligibility consequences affecting K.M.'s reputation, participation, coaching, instruction, education, and economic opportunities.

304. The Fourth Circuit's holding in *Navarro v. United States Center for SafeSport*, No. 24-2118, 2026 WL 1299548 (4th Cir. Apr. 3, 2026), that SafeSport is not a state actor for purposes of internal membership determinations is inapposite and does not control here. *Navarro* involved trainers challenging SafeSport's procedures for barring them from Olympic sports, a purely internal membership decision.

305. This case is materially different. It challenges SafeSport's affirmative actions that injected a private investigation into the public criminal justice system and directed the course of a criminal prosecution.

306. The Supreme Court has recognized that where a private actor has "participated in the investigation and prosecution of [the plaintiff]," state action may be found. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982). Furthermore, SafeSport's own statutory framework recognizes that it may provide work product "*to a law enforcement agency for the purpose of assisting in a criminal investigation*." 36 U.S.C. § 220541(f)(4)(C)(ii). SafeSport did not merely invoke this provision passively; it affirmatively and aggressively utilized it to influence and direct the Florida criminal process against K.M.

307. K.M. does not allege that SafeSport is a state actor for all purposes. K.M. alleges that SafeSport is a state actor *as applied* to the conduct challenged in this case. The distinction is well-established. In *Brentwood Academy*, the Supreme Court held that a private athletic association could be a state actor despite its private status because of its "*pervasive entwinement*" with public schools. *Brentwood Academy*, 531 U.S. at 296-97. The same analysis applies here.

308. SafeSport's conduct is alleged to have been pervasively entwined with Florida criminal process. SafeSport initiated that process through false or misleading reporting. SafeSport directed that process by encouraging K.F. to file charges after K.M. produced exculpatory evidence. SafeSport controlled the evidence in that process by selectively producing materials and withholding exculpatory information. SafeSport resisted criminal court orders and law enforcement subpoenas. The criminal court itself found that SafeSport's conduct violated K.M.'s right to due process.

309. These allegations, if proven, establish the kind of "*joint participation*" that renders a private actor's conduct state action. *See Lugar*, 457 U.S. at 941-42 (private actor who "*willfully participates in joint activity with the State or its agents*" is subject to constitutional constraints).

310. USA Water Polo also acted under a federally recognized national-governing-body framework, acted jointly with SafeSport, and gave practical effect to SafeSport's restrictions, sanctions, labels, database entries, eligibility consequences, and participation consequences. USA Water Polo's recognition, transmission, enforcement, or continued reliance on SafeSport consequences gave those consequences practical force within the USA Water Polo-affiliated ecosystem.

311. K.M. possessed protected liberty and property interests, including her interests in reputation plus participation consequences, athletic eligibility, water polo participation, coaching and instructional opportunities, private swim-lesson opportunities, educational opportunities, economic opportunities, and freedom from the continuing use of materially false, incomplete, tainted, unreliable, or misleading

allegations and disciplinary labels that foreseeably affect her ability to participate, coach, instruct, work, study, and associate within the USA Water Polo-affiliated community.

312. The deprivation of these interests is not merely a private membership dispute. The Supreme Court has long recognized that "*liberty*" protected by the Fourteenth Amendment includes the right to engage in one's chosen occupation or profession. See *Board of Regents v. Roth*, 408 U.S. 564, 572-73 (1972); *Greene v. McElroy*, 360 U.S. 474, 492-93 (1959) (government may not "*take away*" an individual's "right to follow a chosen trade or profession" without due process). Additionally, when the government imposes "*a stigma or other disability that forecloses [the individual's] freedom to take advantage of other employment opportunities*," a liberty interest is implicated. *Roth*, 408 U.S. at 573-74. Here, SafeSport's disciplinary labels, restrictions, and eligibility consequences, adopted and enforced through the national governing body framework, operate to foreclose K.M. from paid coaching and instruction opportunities, a function that, when carried out in conjunction with state law enforcement, is subject to constitutional constraints.

313. K.M. also possessed protected interests arising from membership, participation, SafeSport jurisdiction, USA Water Polo affiliation, the SafeSport Code, USA Water Polo membership and participation rules, incorporated procedures, written agreements, third-party-beneficiary obligations, membership-based obligations, and equitable duties governing the investigation, response, resolution, discipline, eligibility, and enforcement processes applied to her.

314. Defendants deprived K.M. of those protected interests by converting her from claimant into respondent and criminal suspect before fairly testing her report;

causing or materially contributing to Florida criminal process; maintaining or relying on materially shifting accusations; withholding or restricting exculpatory and impeachment information; imposing or maintaining sanctions, restrictions, probationary conditions, no-contact restrictions, training requirements, adverse records, database entries, public-facing disciplinary labels, and eligibility consequences; and causing or permitting those consequences to be recognized, transmitted, enforced, published, or given practical effect by USA Water Polo and others within the Olympic and Paralympic Movement.

315. The process afforded to K.M. was constitutionally inadequate as applied. K.M. was not provided a meaningful opportunity to be heard before SafeSport's investigator identified her as a criminal suspect and materially contributed to Florida criminal process. K.M. was not provided timely and complete access to exculpatory and impeachment information. K.M. was required to defend against shifting dates, shifting locations, shifting allegations, and materially inconsistent witness accounts. K.M. was required to litigate for access to SafeSport materials that bore directly on the reliability of the accusations and the fairness of the criminal and disciplinary processes. The Supreme Court has held that "*the government may not use a private party as a conduit for action that itself violates the Constitution*." *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 552-53 (1987).

316. Here, SafeSport acted as more than a conduit, it was an active participant in the deprivation. By (a) reporting K.M. to law enforcement as a suspect before interviewing her, (b) making false or misleading representations to law enforcement, (c) directing or encouraging a witness to file criminal charges, (d) selectively producing

evidence while withholding exculpatory materials, and (e) continuing to enforce disciplinary consequences after the criminal court found it had withheld exculpatory evidence in bad faith and with malice, SafeSport crossed the line from private actor to joint participant in state action. Where the state's "*involvement with the private actor is extensive and intimate*," constitutional scrutiny is warranted. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296-97 (2001). The Florida criminal court's orders, subpoenas, and the State's repeated efforts to obtain exculpatory evidence demonstrate exactly the kind of government entwinement and participation that triggers constitutional obligations.

317. SafeSport's process was further deficient because SafeSport had an institutional interest in defending the same investigative narrative it had already used to justify criminal reporting, disciplinary action, sanctions, and eligibility consequences. As applied to K.M., SafeSport could not fairly act as reporter, investigator, evidence custodian, disciplinary authority, and defender of its own prior conduct while withholding or restricting access to exculpatory information bearing on the truth of the accusations.

318. The Supreme Court has recognized that due process requires "*an impartial decisionmaker*" and that "*the combination of investigative and adjudicative functions does not, without more, constitute a due process violation*." *Withrow v. Larkin*, 421 U.S. 35, 58-59 (1975). However, where a decisionmaker has a "*personal stake*" in the outcome or has "already adjudicated the merits" of the case, due process requires additional safeguards. *See Hortonville Joint School Dist. No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 493-94 (1976).

Here, SafeSport had already committed to its investigative narrative by reporting K.M. to law enforcement, directing witness statements, and selectively producing evidence. Its subsequent arbitration process could not cure this pre-existing commitment. The criminal court's findings that SafeSport intentionally withheld exculpatory evidence and acted in bad faith confirm that SafeSport's institutional interest in the outcome of its investigation was so strong that it could not thereafter serve as a neutral decisionmaker or evidence custodian.

319. USA Water Polo's process was also deficient because USA Water Polo recognized, transmitted, enforced, relied upon, or gave practical effect to SafeSport restrictions, records, labels, database entries, sanctions, and eligibility consequences without adequate independent review and without adequate safeguards against materially false, incomplete, tainted, or unreliable disciplinary labels.

320. The deprivation was not limited to a temporary internal sports consequence. SafeSport and USA Water Polo's actions affected K.M.'s participation, reputation, education, paid swim-instruction work, private swim lessons, coaching opportunities, athlete-development opportunities, and background-search consequences. The September 3, 2026, background-search report alleged herein illustrates that criminal-case information and SafeSport-related labels can continue to appear in public-record, data-aggregation, and background-search systems after criminal cases are dismissed.

321. The risk of erroneous deprivation was substantial. SafeSport proceeded despite a prior school investigation that closed without further police involvement, the

absence of any police report before SafeSport's intervention, shifting witness accounts, changed dates and locations, sworn admissions that law-enforcement statements were inaccurate, omitted or restricted exculpatory information, and judicial findings that SafeSport intentionally withheld exculpatory evidence, acted in bad faith, intentionally, and with malice, and repeatedly and knowingly interfered with the investigation.

322. Additional safeguards were required and were feasible. Defendants could have provided prompt neutral review, meaningful pre-deprivation notice, a meaningful opportunity to respond before law-enforcement referral and before market-facing eligibility consequences, access to exculpatory and impeachment information, independent USA Water Polo review before recognition or enforcement, nonpublic interim restrictions, tailored no-contact measures, supervised participation, correction or removal of tainted records after material contradictions surfaced, and refusal to give continuing effect to records and labels derived from incomplete or unreliable information.

323. Defendants had no legitimate interest in maintaining, transmitting, publishing, recognizing, enforcing, relying upon, or giving gatekeeping effect to materially false, incomplete, tainted, unreliable, or misleading allegations, records, disciplinary labels, database entries, restrictions, sanctions, eligibility consequences, institutional communications, public-facing records, or participation consequences after learning facts that materially undermined their reliability.

324. K.M. does not allege under this count that every SafeSport investigation, every athlete-safety report, or every national-governing-body enforcement action is

federal action or violates federal due process. K.M. alleges that Defendants violated federal due process as applied here because SafeSport used federally recognized authority, law-enforcement access, investigative control, and national-governing-body enforcement to impose criminal, athletic, reputational, educational, and economic consequences while withholding or restricting exculpatory information and continuing to give practical effect to tainted allegations, records, labels, and eligibility consequences.

325. An actual controversy exists concerning whether Defendants may continue to maintain, recognize, enforce, publish, transmit, rely upon, or give gatekeeping effect to records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences imposed through a process that violated federal due process as applied to K.M.

326. K.M. is entitled to a declaration that Defendants violated federal procedural due process as applied to K.M. by depriving her of protected liberty and property interests without fair notice, a meaningful opportunity to be heard, meaningful access to exculpatory and impeachment information, neutral and reliable decision-making, adequate safeguards against false or tainted allegations, and a meaningful mechanism to correct or limit continuing reliance on defective records and labels.

327. K.M. is further entitled to necessary or proper relief under 28 U.S.C. § 2202, including correction, removal, retraction, restricted dissemination, nonuse, nonrecognition, nonenforcement, notice to affected entities, and other equitable relief necessary to prevent Defendants from continuing to rely upon or give practical effect to

records, labels, restrictions, sanctions, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences imposed through a process that violated federal due process as applied to K.M.

328. K.M. does not seek damages under this count. K.M. seeks declaratory relief, injunctive relief, further necessary or proper relief under 28 U.S.C. § 2202, costs, attorneys' fees where available, and all other non-damages relief permitted by law.

**COUNT XII - PRIVATE NONDELEGATION / UNCONSTITUTIONAL DELEGATION OF GOVERNMENTAL POWER, IN THE ALTERNATIVE**
**Against SafeSport and USA Water Polo**

329. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 28 through 131 concerning SafeSport's investigation, law-enforcement reporting, disciplinary process, arbitration, sanctions, eligibility consequences, omitted or restricted exculpatory evidence, USA Water Polo's recognition or enforcement of SafeSport consequences, background-search consequences, and continuing interference with K.M.'s athletic and economic relationships; paragraphs 132 through 144 concerning the expungement proceedings, Supplemental Order, and issue-preclusion allegations; paragraphs 145 through 161 concerning SafeSport's authority, USA Water Polo's role, the organizational framework, gatekeeping authority, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 234 through 254 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, economic injury, and the need for correction, retraction, removal, restricted dissemination, and nonuse of false or materially

misleading labels; paragraphs 255 through 266 concerning publication, database use, disciplinary labels, and the continuing effect of tainted allegations; paragraphs 267 through 281 concerning Defendants' ultra vires conduct and exceeding statutory authority; and paragraphs 282 through 300 concerning federal procedural due process.

330. This count is pleaded in the alternative. If SafeSport and USA Water Polo contend that the conduct alleged herein was authorized by federal athlete-safety law, the SafeSport Code, national-governing-body obligations, incorporated procedures, or the statutory structure governing the Olympic and Paralympic Movement, then K.M. alleges that the asserted authorization reflects an unconstitutional delegation of governmental power to private entities as applied to her.

331. Congress recognized SafeSport as the independent national safe sport organization for the United States Olympic and Paralympic Movement and gave SafeSport authority that affects the opportunity of amateur athletes and participants to participate in amateur athletic competition. SafeSport's authority is implemented through the SafeSport Code, national-governing-body incorporation, mandatory recognition or enforcement, public-facing disciplinary consequences, database entries, eligibility consequences, and participation restrictions. This delegation is not merely an authorization for private governance of amateur athletics.

332. As applied here, it authorized SafeSport to perform functions that are quintessentially governmental: initiating and directing criminal investigations, influencing prosecutorial decisions, withholding exculpatory evidence from criminal

proceedings, and imposing consequences that affect an individual's liberty, reputation, and economic opportunities.

333. The Supreme Court has recognized that "the nondelegation doctrine is rooted in the principle of separation of powers." *Gundy v. United States*, 588 U.S. 128, 138 (2019).

334. When Congress delegates governmental power to a private entity without adequate procedural safeguards, the resulting actions are subject to constitutional challenge. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (private delegations "*are legislative acts" and must "be made by the legislature*"). SafeSport's statutory framework authorizes it to (a) receive reports of abuse, (b) investigate allegations, (c) adjudicate charges, (d) impose sanctions affecting participation and eligibility, (e) maintain public-facing disciplinary records, and (f) cooperate with law enforcement by providing work product. 36 U.S.C. § 220541(f)(4)(C)(ii).

335. This is a delegation of governmental police and adjudicatory power. When a private actor exercises such power to influence criminal proceedings, constitutional safeguards must attach.

336. The private nondelegation doctrine is not limited to cases where the private actor is a state actor for all purposes. The doctrine addresses whether Congress may delegate governmental power to private entities without adequate safeguards, and whether the exercise of that delegated power, as applied to a particular individual, violates constitutional principles. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)

(delegation of governmental power to private industry "is a legislative act" and must "be made by the legislature").

337. Even if SafeSport is not a state actor for all purposes, it exercises delegated governmental power. That delegated power, as applied to K.M., was exercised in a manner that violated fundamental principles of fairness: SafeSport converted a claimant into a criminal suspect, misrepresented facts to law enforcement, directed the filing of criminal charges, withheld exculpatory evidence from a criminal court, and continued enforcing consequences after being found to have acted in bad faith and with malice.

338. The criminal court's findings demonstrate that the delegation of power to SafeSport, as applied to K.M., lacked the safeguards necessary to prevent abuse. *See Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 65-66 (2015) (Alito, J., concurring) ("*If the government delegates a public function to a private entity, constitutional constraints should apply*.").

339. As applied to K.M., SafeSport did not merely make a private membership recommendation. SafeSport exercised delegated authority in a manner that converted K.M. from claimant into respondent and criminal suspect, caused or materially contributed to Florida criminal process, controlled or restricted access to evidence bearing on K.M.'s criminal defense, imposed or maintained sanctions and eligibility consequences, and caused or permitted USA Water Polo to recognize, enforce, transmit, or give practical effect to those consequences.

340. USA Water Polo, as the national governing body for water polo, gave practical force to SafeSport's delegated authority by recognizing, transmitting, enforcing,

relying upon, or failing to correct SafeSport restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, and participation consequences affecting K.M.

341. The delegation alleged herein is constitutionally defective as applied because SafeSport exercised coercive, adjudicatory, investigative, sanctioning, records-control, eligibility, and market-facing authority without adequate governmental supervision, without meaningful public accountability, without sufficient neutral review, and without constitutionally adequate safeguards to protect K.M. from false, incomplete, tainted, unreliable, or misleading allegations and labels. The defect is not merely theoretical.

342. This case demonstrates precisely how the delegation fails in practice. SafeSport: (a) converted a claimant who sought help into a criminal suspect, (b) reported K.M. to law enforcement before interviewing her, (c) misrepresented that E.C. had reported the incident to SafeSport, (d) directed K.F. to file criminal charges, (e) withheld exculpatory evidence from the criminal court, (f) refused to comply with court orders and subpoenas, (g) continued enforcing sanctions after the criminal court found bad faith and intentional misconduct, and (h) continued maintaining public-facing disciplinary labels and eligibility consequences that affect K.M.'s reputation and economic opportunities.

343. The criminal court's Supplemental Order found that SafeSport's conduct was "clear, convincing, and beyond doubt" a fraud upon the court, the People, the Sheriff's Office, the State's Attorney Office, and the defendant; that SafeSport intentionally withheld exculpatory evidence; and that SafeSport acted in bad faith,

intentionally, and with malice. These findings confirm that the delegation lacked adequate safeguards to prevent abuse. *See Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 65-66 (2015) (Alito, J., concurring) (Congress may not "delegate governmental power to a private entity without any effective means of supervision or accountability").

344. The defect is especially serious because SafeSport's authority, as applied here, reached beyond internal athletic discipline. SafeSport's conduct affected Florida criminal process, criminal discovery, law-enforcement access to evidence, judicial proceedings, public-record and background-search consequences, athletic eligibility, paid coaching and instruction opportunities, private swim-lesson opportunities, educational opportunities, reputation, and access to USA Water Polo-affiliated opportunities.

345. SafeSport's structure allowed a private entity to act as reporter, investigator, evidence custodian, adjudicatory actor, sanctioning authority, records maintainer, and practical gatekeeper while also denying the public-law duties that ordinarily accompany such power. SafeSport cannot simultaneously invoke federally recognized authority and mandatory national-governing-body enforcement to impose serious consequences while disclaiming constitutionally adequate safeguards when those consequences are challenged. The Supreme Court has held that "the State may not avoid constitutional scrutiny by delegating its authority to a private entity." *Evans v. Newton*, 382 U.S. 296, 298-99 (1966).

346. Here, Congress has delegated to SafeSport the power to investigate, adjudicate, and sanction, powers traditionally exercised by government agencies. SafeSport has used this delegated power to affect criminal proceedings, control access to evidence, and impose consequences that "*foreclose*" individuals from their chosen occupations. When a private entity exercises such power, it must provide the procedural protections that would be required if the government itself were acting. *See Norwood v. Harrison*, 413 U.S. 455, 469 (1973) (private actor exercising state power "*must meet the standards applicable to the state*").

347. SafeSport's reliance on its private status to avoid constitutional scrutiny, while simultaneously using congressionally delegated authority to influence criminal proceedings and impose career-ending consequences, is precisely the "accountability gap" that the nondelegation doctrine was designed to prevent.

348. USA Water Polo's automatic or practical recognition and enforcement of SafeSport restrictions, sanctions, database entries, disciplinary labels, and eligibility consequences compounded the unconstitutional delegation because it gave SafeSport's private determinations binding practical effect within the recognized water polo ecosystem without adequate independent review or meaningful safeguards.

349. As applied to K.M., the delegation permitted SafeSport and USA Water Polo to impose, maintain, recognize, enforce, transmit, publish, or give gatekeeping effect to sanctions, restrictions, database entries, disciplinary labels, eligibility consequences, public-facing records, and institutional communications even after material contradictions surfaced, the criminal cases were dismissed, and the Supplemental Order

found intentional withholding of exculpatory evidence, bad faith, malice, interference with the investigation, and fraud upon the court.

350. The delegation was unconstitutional as applied because it allowed private entities to exercise governmental or quasi-governmental power over K.M.'s liberty, reputation, participation, eligibility, and economic opportunities without adequate governmental control, without adequate neutral review, and without a constitutionally sufficient mechanism to correct or prevent continuing reliance on tainted records and labels.

351. K.M. does not allege under this count that Congress may never authorize a private athlete safety organization, that SafeSport may never investigate abuse allegations, or that USA Water Polo may never recognize valid athlete-safety restrictions. K.M. alleges that, as applied here, Defendants used the delegated structure to impose and continue serious criminal, athletic, reputational, database, and economic consequences through a process lacking adequate governmental supervision, neutral review, and safeguards against materially false, incomplete, tainted, or unreliable records. The distinction is critical.

352. In *Navarro*, the court considered a challenge to SafeSport's internal adjudication procedures. That court's holding that SafeSport is not a state actor does not resolve the nondelegation issue. The nondelegation doctrine addresses whether Congress may delegate governmental power to a private entity at all, or, if it may, whether the delegation includes adequate safeguards. *See Carter v. Carter Coal Co.*, 298

U.S. at 291-92 (delegation to private industry of power to set wages and hours violated nondelegation doctrine).

353. Here, as applied, SafeSport exercised power over criminal proceedings, evidence disclosure, and career consequences without any meaningful supervision, accountability, or procedural safeguards. The criminal court's findings that SafeSport acted in bad faith, intentionally withheld exculpatory evidence, and perpetrated a fraud upon the court demonstrate precisely why the delegation, as applied, is constitutionally defective. Even if SafeSport is not a state actor for all purposes, it may not exercise governmental power without governmental accountability.

354. Less constitutionally problematic alternatives were available. Those alternatives included meaningful governmental supervision of coercive or adjudicatory authority, independent review before national-governing-body enforcement, prompt neutral review of restrictions, meaningful access to exculpatory and impeachment information, limits on public-facing database use, nonpublic interim measures, tailored participation restrictions, correction or removal of tainted records after material contradictions surfaced, and a meaningful mechanism to prevent continuing reliance on defective records and labels.

355. An actual controversy exists because Defendants continue, or on information and belief may continue, to maintain, recognize, enforce, publish, transmit, rely upon, or give gatekeeping effect to records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-

facing records, or participation consequences imposed through the allegedly unconstitutional delegation of governmental power.

356. K.M. is entitled to a declaration that, as applied to her, Defendants' creation, maintenance, recognition, enforcement, publication, transmission, or gatekeeping use of materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences resulted from an unconstitutional delegation of governmental power to private entities without constitutionally adequate supervision, accountability, and safeguards.

357. K.M. is further entitled to necessary or proper relief under 28 U.S.C. § 2202, including correction, removal, retraction, restricted dissemination, nonuse, nonrecognition, nonenforcement, notice to affected entities, and other equitable relief necessary to prevent Defendants from continuing to rely upon or give practical effect to records, labels, restrictions, sanctions, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences imposed through the unconstitutional delegation alleged herein.

358. K.M. does not seek damages under this count. K.M. seeks declaratory relief, injunctive relief, further necessary or proper relief under 28 U.S.C. § 2202, costs, attorneys' fees where available, and all other non-damages relief permitted by law.

**COUNT XIII - VIOLATION OF SHERMAN ACT § 1, 15 U.S.C. § 1, GROUP BOYCOTT AND, IN THE ALTERNATIVE, RULE-OF-REASON RESTRAINT OF TRADE**
**Against SafeSport and USA Water Polo**

359. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 95 through 113 concerning causation, background-search consequences, and lost athletic, coaching, instructional, educational, and economic opportunities; paragraphs 114 through 131 concerning the SafeSport arbitration, sanctions, records, eligibility consequences, and USA Water Polo's recognition or enforcement of SafeSport consequences; paragraphs 145 through 161 concerning the organizational framework, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 237 through 246 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, and economic injury; paragraphs 255 through 266 concerning publication, database use, disciplinary labels, and continuing effect of tainted allegations; paragraphs 267 through 281 concerning Defendants' ultra vires conduct and exceeding statutory authority; paragraphs 282 through 300 concerning federal procedural due process; and paragraphs 301 through 317 concerning unconstitutional delegation of governmental power.

360. SafeSport and USA Water Polo entered into, participated in, maintained, or enforced contracts, combinations, agreements, rules, policies, incorporated procedures, membership requirements, eligibility requirements, club requirements, and automatic-enforcement mechanisms that required USA Water Polo, USA Water Polo clubs, coaches, instructors, athletes, participants, and affiliated programs to recognize and give effect to

SafeSport suspensions, restrictions, disciplinary labels, database entries, eligibility consequences, and participation consequences.

361. The challenged restraint occurred in and substantially affected interstate commerce. SafeSport is a Colorado entity exercising national authority over Olympic and Paralympic Movement participants; USA Water Polo is a California entity serving as the national governing body for water polo in the United States; the relevant rules, policies, membership requirements, SafeSport training requirements, background-screening requirements, disciplinary labels, eligibility consequences, and database entries operate across state lines; and the restraint affected Florida-based paid coaching, instruction, private-lesson, club, and athlete-development opportunities connected to a national governing body system.

362. The challenged restraint is not legitimate athlete-safety enforcement in the abstract. The challenged restraint is Defendants' automatic recognition, enforcement, transmission, publication, and gatekeeping use of SafeSport restrictions, disciplinary labels, database entries, eligibility consequences, and records without adequate independent review, without adequate safeguards against false or tainted information, and without correction or limitation after material contradictions surfaced.

363. As applied to K.M., the restraint operated as a group boycott or concerted refusal to deal because SafeSport and USA Water Polo's rules, policies, incorporated procedures, membership requirements, club requirements, eligibility requirements, and automatic-enforcement mechanisms caused USA Water Polo-affiliated clubs, coaches, instructors, athletes, participants, and affiliated programs to exclude, avoid, restrict,

refuse to deal with, or cease dealing with K.M. as a paid instructor, coach, participant, and provider of athlete-development services.

364. The group-boycott effect was not theoretical. K.M. worked as a full-time swim instructor with Seminole Aquatics, a USA Water Polo club subject to USA Water Polo and SafeSport rules, where she earned approximately $20.00 per hour. K.M. also provided private swim lessons for compensation and later coached water polo at Patriot Aquatics. When SafeSport suspended K.M., USA Water Polo eligibility consequences made her ineligible to participate in the USA Water Polo system, and Seminole Aquatics removed her from her paid swim-instruction position. Patriot Aquatics later removed K.M. from water polo coaching when SafeSport suspended her again and allowed her to return after the suspension was lifted.

365. Upon information and belief, Emily Cummings obtained the same or substantially similar paid work K.M. lost, including the same job, same hours, same clients, same classes, or same paid instruction opportunities. Parents, students, athletes, and clients who wished to receive instruction from K.M. were deprived of that choice because of SafeSport's suspension and USA Water Polo's automatic recognition or enforcement of that suspension.

366. The relevant market, or alternatively relevant submarket, is the market for paid youth aquatics instruction, private swim lessons, water polo coaching, and athlete-development services in the United States. Within this broader market, the relevant submarket is the market for paid coaching and instruction services that require or rely

upon USA Water Polo eligibility, SafeSport clearance, SafeSport training, background screening, good-standing status, or national-governing-body recognition.

367. This submarket is a cognizable "*input market*" in which USA Water Polo-affiliated clubs, programs, coaches, and instructors compete for the services of qualified coaches and instructors. *See In re NCAA I-A Walk-On Football Players Litigation*, 2005 WL 2335348 at *6 (N.D. Cal. Sept. 13, 2005) (recognizing an "input market" where schools compete for skilled amateur football players). The relevant product market includes the pool of services that enjoy "reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. Univ. of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

368. There are no viable substitutes for USA Water Polo-affiliated coaching and instruction opportunities because participation in recognized water polo competitions, clubs, and athlete-development programs requires USA Water Polo eligibility and SafeSport compliance. A coach or instructor excluded from SafeSport and USA Water Polo eligibility cannot obtain the same quality or quantity of paid instruction and coaching opportunities through alternative providers because the USA Water Polo system dominates the market for organized water polo instruction and coaching in the United States. *See NCAA v. Board of Regents*, 468 U.S. 85, 111-12 (1984) (recognizing that intercollegiate football broadcasts constitute a separate market because there are "no other products that are reasonably substitutable for televised NCAA football games").

369. The USA Water Polo-affiliated submarket is therefore a distinct economic market for antitrust purposes.

370. In that market or submarket, SafeSport and USA Water Polo possessed substantial market power and practical gatekeeping authority. USA Water Polo is the national governing body for water polo in the United States. USA Water Polo-affiliated clubs, programs, coaches, instructors, athletes, and participants rely on USA Water Polo membership, eligibility, good-standing status, and SafeSport compliance to participate in sanctioned practices, competitions, instruction, coaching, club programs, and athlete-development opportunities.

371. SafeSport's disciplinary labels, restrictions, suspensions, database entries, and eligibility consequences therefore operate as market-access conditions for paid coaching, instruction, and athlete-development services within the recognized water polo ecosystem.

372. There were no reasonably interchangeable practical substitutes for USA Water Polo-affiliated water polo coaching, club instruction, eligibility-dependent aquatics instruction, and athlete-development opportunities for K.M. in the relevant market or submarket. A person excluded from SafeSport and USA Water Polo eligibility is not merely excluded from an internal private-club preference. Such a person can be excluded from the recognized USA Water Polo system through which paid water polo coaching, club instruction, athlete development, team opportunities, and reputation-dependent aquatics opportunities are obtained.

373. SafeSport and USA Water Polo's automatic-enforcement structure cut off K.M.'s access to facilities, programs, clubs, clients, students, parents, athletes, and paid opportunities necessary for K.M. to compete as a provider of paid USA Water Polo-

affiliated water polo coaching, club instruction, private water polo instruction, eligibility-dependent aquatics instruction, and athlete-development services.

374. Defendants' conduct had the practical effect of a collective refusal to deal because USA Water Polo-affiliated clubs, programs, and participants were required or expected to recognize SafeSport restrictions and eligibility consequences and to treat K.M. as ineligible, suspended, restricted, or otherwise unavailable for participation, coaching, instruction, and related paid opportunities.

375. The restraint excluded K.M. from paid market participation, shifted work to another market participant, deprived parents, students, athletes, and clients of their preferred instructor or coach, reduced available coaching and instruction choices, impaired consumer choice, and reduced competition in the relevant market or submarket. This is an injury to competition in the input market for coaching and instruction services. *See In re NCAA I-A Walk-On Football Players Litigation*, 2005 WL 2335348 at *6 ("*[P]laintiffs have sufficiently alleged injury to competition" where they described "injury to the input market*").

376. By requiring USA Water Polo-affiliated clubs to automatically recognize and enforce SafeSport suspensions and restrictions without independent review, Defendants have reduced competition among coaches and instructors by removing qualified participants from the market and limiting consumer choice. Defendants' conduct has reduced the supply of available coaches and instructors, harmed the quality and diversity of instruction available to athletes, parents, students, and clients, and artificially constrained the market for paid coaching and instruction services. The injury

to K.M. flows from this injury to competition and is the type of injury the antitrust laws were designed to prevent. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (antitrust injury requires injury "*of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful*").

377. Upon information and belief, the automatic recognition and enforcement of SafeSport suspensions, restrictions, disciplinary labels, database entries, eligibility consequences, and participation consequences is standard practice within USA Water Polo and the Olympic and Paralympic Movement. The challenged restraint therefore creates a broader exclusionary mechanism capable of removing coaches, instructors, athletes, and participants from paid opportunities without independent market-facing review by USA Water Polo and without adequate safeguards against tainted or unreliable disciplinary labels.

378. Defendants' restraint produced anticompetitive effects in the relevant market or submarket, including exclusion of a competing instructor and coach, reduction in available instruction and coaching choices, impairment of consumer choice, forced substitution of providers, foreclosure of K.M. from paid opportunities, and maintenance of a system in which access to paid coaching, instruction, and athlete-development services depends on automatic enforcement of SafeSport disciplinary labels regardless of whether the underlying process was materially incomplete, unreliable, contradicted, or tainted.

379. To the extent Defendants contend that the challenged conduct should not be treated as a per se unlawful group boycott, K.M. pleads in the alternative that Defendants' conduct unreasonably restrained trade under the rule of reason.

380. Defendants' conduct has harmed competition, not merely K.M. First, the automatic and uncritical recognition and enforcement of SafeSport disciplinary labels has reduced the pool of available coaches and instructors in the market by excluding qualified individuals based on unreliable or tainted disciplinary determinations. Second, consumers, including athletes, parents, students, clubs, and teams, have been deprived of choice in selecting coaches and instructors, forced to accept substitutes they would not have chosen but for Defendants' exclusionary conduct.

381. Third, the market has been deprived of a competing provider of coaching and instruction services, reducing the competitive pressure that would otherwise exist among providers. Fourth, the challenged structure creates a barrier to entry because coaches and instructors cannot participate in the USA Water Polo system without SafeSport clearance, and SafeSport's process lacks adequate safeguards against false or tainted allegations.

382. These harms to competition are the type the antitrust laws were designed to prevent. *See NCAA v. Board of Regents*, 468 U.S. 85, 107 (1984) ("*Congress designed the Sherman Act as a 'consumer welfare prescription'*"); *In re NCAA I-A Walk-On Football Players Litigation*, 2005 WL 2335348 at *6 (antitrust injury in input market can be shown by "*decrease in allocative efficiency and an increase in price*").

383. Defendants' restraint was broader than necessary to serve any legitimate athlete-safety purpose. Less restrictive alternatives were available, including prompt neutral review, temporary confidential restrictions, tailored no-contact conditions, supervised participation, nonpublic interim status, independent USA Water Polo review before club-level enforcement, correction or removal of tainted records after material contradictions surfaced, and refusal to give continuing effect to disciplinary labels derived from incomplete or unreliable information.

384. The anticompetitive effects of the challenged automatic-enforcement structure outweighed any procompetitive justification because Defendants could protect athlete safety through less restrictive means without automatically excluding K.M. and similarly situated persons from paid coaching, instruction, private-lesson, and athlete-development opportunities based on tainted or unreliable disciplinary labels.

385. K.M. suffered antitrust injury because her business and property injuries flowed from the competition-reducing aspect of Defendants' conduct. K.M. lost paid swim-instruction work, private-lesson opportunities, water polo coaching opportunities, and other economic opportunities because Defendants' automatic-enforcement structure excluded her from market participation, shifted work to another market participant, deprived consumers of their preferred instructor, and reduced competition and consumer choice in the relevant market or submarket.

386. K.M.'s injuries were direct and foreseeable. Defendants knew or should have known that a SafeSport suspension, disciplinary label, ineligibility designation, or USA Water Polo-recognized eligibility consequence would remove K.M. from paid

coaching, instruction, club, private-lesson, and athlete-development opportunities because USA Water Polo-affiliated clubs, coaches, instructors, athletes, parents, and programs rely on SafeSport and USA Water Polo eligibility status when deciding who may participate, coach, instruct, or provide services.

387. K.M. seeks treble damages, costs, and attorneys' fees under 15 U.S.C. § 15 for injuries to her business or property caused by Defendants' violation of Sherman Act § 1. K.M. also seeks injunctive relief under 15 U.S.C. § 26 requiring Defendants to cease automatic recognition, enforcement, transmission, publication, or gatekeeping use of materially false, incomplete, tainted, or unreliable restrictions, disciplinary labels, database entries, records, sanctions, eligibility consequences, or participation consequences concerning K.M.

**COUNT XIV - VIOLATION OF SHERMAN ACT § 2, 15 U.S.C. § 2, MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION**
**Against USA Water Polo and, in the Alternative, SafeSport**

388. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 95 through 113 concerning causation, background-search consequences, and lost athletic, coaching, instructional, educational, and economic opportunities; paragraphs 114 through 131 concerning the SafeSport arbitration, sanctions, records, eligibility consequences, and USA Water Polo's recognition or enforcement of SafeSport consequences; paragraphs 145 through 161 concerning the organizational framework, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 237 through 246 concerning false or

materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, and economic injury; paragraphs 255 through 266 concerning publication, database use, disciplinary labels, and continuing effect of tainted allegations; paragraphs 267 through 281 concerning Defendants' ultra vires conduct and exceeding statutory authority; paragraphs 282 through 300 concerning federal procedural due process; paragraphs 301 through 317 concerning unconstitutional delegation of governmental power; and paragraphs 318 through 338 concerning Defendants' group boycott and rule-of-reason restraint of trade.

389. The relevant market, or alternatively relevant submarket, is the market for paid USA Water Polo-affiliated water polo coaching, club instruction, private water polo instruction, aquatics instruction connected to USA Water Polo-affiliated club participation, and athlete-development services for athletes, parents, students, clubs, and teams that require or rely upon USA Water Polo eligibility, SafeSport clearance, SafeSport training, background screening, good-standing status, or national-governing-body recognition.

390. USA Water Polo possessed monopoly power, or a dangerous probability of obtaining monopoly power, in the relevant market or submarket. USA Water Polo is the national governing body for water polo in the United States. USA Water Polo controls or substantially influences membership, eligibility, good-standing status, sanctioned competition, club participation, participation pathways, athlete-development pathways, and recognized access to USA Water Polo-affiliated programs, clubs, teams, coaches, instructors, events, and opportunities.

391. USA Water Polo-affiliated clubs, programs, coaches, instructors, athletes, and participants rely on USA Water Polo membership, eligibility, good-standing status, SafeSport compliance, background screening, SafeSport training, and national-governing-body recognition to participate in sanctioned practices, competitions, instruction, coaching, club programs, athlete-development opportunities, and related paid opportunities.

392. There were no reasonably interchangeable practical substitutes for USA Water Polo-affiliated water polo coaching, club instruction, eligibility-dependent aquatics instruction, and athlete-development opportunities for K.M. in the relevant market or submarket. A person excluded from SafeSport and USA Water Polo eligibility is not merely excluded from an internal private-club preference. Such a person can be excluded from the recognized USA Water Polo system through which paid water polo coaching, club instruction, athlete development, team opportunities, and reputation-dependent aquatics opportunities are obtained.

393. USA Water Polo willfully maintained, used, or attempted to maintain monopoly power by recognizing, transmitting, enforcing, relying upon, or giving practical effect to SafeSport restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and participation consequences without adequate independent review and without adequate safeguards against materially false, incomplete, tainted, unreliable, or misleading disciplinary labels.

394. USA Water Polo's conduct was exclusionary because it used its national-governing-body authority and practical control over USA Water Polo-affiliated

participation to exclude K.M. from paid swim-instruction, private-lesson, water polo coaching, club instruction, and athlete-development opportunities. USA Water Polo's recognition or enforcement of SafeSport consequences caused K.M. to lose paid work at Seminole Aquatics and caused or contributed to the loss or impairment of coaching and instruction opportunities at Patriot Aquatics and elsewhere.

395. The exclusion was not the result of ordinary competition on the merits. It resulted from USA Water Polo's recognition, transmission, enforcement, or practical use of SafeSport restrictions, sanctions, labels, database entries, eligibility consequences, and disciplinary records derived from a process alleged herein to be materially incomplete, unreliable, contradicted, and tainted.

396. Upon information and belief, USA Water Polo's automatic or practical recognition and enforcement of SafeSport restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and participation consequences is standard practice within USA Water Polo. That structure gives USA Water Polo the ability to exclude coaches, instructors, athletes, and participants from paid opportunities in the relevant market or submarket based on SafeSport labels and eligibility consequences without independent market-facing review and without adequate safeguards against tainted or unreliable disciplinary records.

397. USA Water Polo's conduct harmed competition in the relevant market or submarket by excluding K.M. as a competing provider of paid instruction, coaching, private lessons, and athlete-development services; reducing available coaching and instruction choices; depriving parents, students, athletes, and clients of their preferred

instructor or coach; shifting K.M.'s paid work to another market participant; and maintaining a gatekeeping system in which access to paid opportunities depends on automatic recognition or enforcement of SafeSport labels regardless of whether the underlying process was materially incomplete, unreliable, contradicted, or tainted.

398. Upon information and belief, Emily Cummings obtained the same or substantially similar paid work K.M. lost, including the same job, same hours, same clients, same classes, or same paid instruction opportunities. That shift of paid work confirms that the challenged conduct did not merely injure K.M. personally. It changed the allocation of paid instruction and coaching opportunities within the relevant market or submarket and deprived consumers of their preferred provider.

399. SafeSport also possessed substantial market power or practical gatekeeping power, or alternatively participated with USA Water Polo in the maintenance or attempted maintenance of USA Water Polo's monopoly power, because SafeSport's restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and public-facing records operate as market-access conditions within USA Water Polo-affiliated coaching, instruction, club, and athlete-development opportunities.

400. To the extent SafeSport is treated as a defendant under this count, SafeSport willfully participated in the exclusionary conduct by creating, maintaining, transmitting, publishing, or causing recognition of restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and records that USA Water Polo and USA Water Polo-affiliated clubs, programs, coaches, instructors, athletes, and participants were required or expected to recognize or enforce.

401. Defendants' conduct was not narrowly tailored to any legitimate athlete-safety purpose. Less restrictive alternatives were available, including prompt neutral review, temporary confidential restrictions, tailored no-contact conditions, supervised participation, nonpublic interim status, independent USA Water Polo review before club-level enforcement, correction or removal of tainted records after material contradictions surfaced, and refusal to give continuing effect to disciplinary labels derived from incomplete or unreliable information.

402. Defendants' conduct had no legitimate procompetitive justification sufficient to outweigh its exclusionary effect. Defendants could protect athlete safety without using materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, or participation consequences to exclude K.M. and similarly situated persons from paid coaching, instruction, private-lesson, club, and athlete-development opportunities.

403. K.M. suffered antitrust injury because her business and property injuries flowed from the competition-reducing aspect of Defendants' conduct. K.M. lost paid swim-instruction work, private-lesson opportunities, water polo coaching opportunities, and other economic opportunities because Defendants' exclusionary conduct foreclosed her from market participation, shifted work to another market participant, deprived consumers of their preferred instructor, and reduced competition and consumer choice in the relevant market or submarket.

404. K.M.'s injuries were direct and foreseeable. Defendants knew or should have known that a SafeSport suspension, disciplinary label, ineligibility designation, or USA Water Polo-recognized eligibility consequence would remove K.M. from paid coaching, instruction, club, private-lesson, and athlete-development opportunities because USA Water Polo-affiliated clubs, coaches, instructors, athletes, parents, and programs rely on SafeSport and USA Water Polo eligibility status when deciding who may participate, coach, instruct, or provide services.

405. Defendants' conduct violated Sherman Act § 2 by maintaining, using, or attempting to maintain monopoly power in the relevant market or submarket through exclusionary conduct rather than competition on the merits.

406. K.M. seeks treble damages, costs, and attorneys' fees under 15 U.S.C. § 15 for injuries to her business or property caused by Defendants' violation of Sherman Act § 2. K.M. also seeks injunctive relief under 15 U.S.C. § 26 requiring Defendants to cease exclusionary recognition, enforcement, transmission, publication, or gatekeeping use of materially false, incomplete, tainted, or unreliable restrictions, disciplinary labels, database entries, records, sanctions, eligibility consequences, or participation consequences concerning K.M.

**COUNT XV - VIOLATION OF SHERMAN ACT § 2, 15 U.S.C. § 2, CONSPIRACY TO MONOPOLIZE**
**Against SafeSport and USA Water Polo**

407. K.M. incorporates paragraphs 1 through 28 concerning the parties, jurisdiction, venue, and the nature of the action; paragraphs 95 through 113 concerning causation, background-search consequences, and lost athletic, coaching, instructional,

educational, and economic opportunities; paragraphs 114 through 131 concerning the SafeSport arbitration, sanctions, records, eligibility consequences, and USA Water Polo's recognition or enforcement of SafeSport consequences; paragraphs 145 through 161 concerning the organizational framework, SafeSport's gatekeeping authority, USA Water Polo's recognition or enforcement role, and the commercial effect of SafeSport and USA Water Polo eligibility consequences; paragraphs 237 through 246 concerning false or materially misleading statements, labels, records, database entries, disciplinary descriptors, eligibility consequences, special damages, and economic injury; paragraphs 255 through 266 concerning publication, database use, disciplinary labels, and continuing effect of tainted allegations; paragraphs 267 through 281 concerning Defendants' ultra vires conduct and exceeding statutory authority; paragraphs 282 through 300 concerning federal procedural due process; paragraphs 301 through 317 concerning unconstitutional delegation of governmental power; paragraphs 318 through 338 concerning Defendants' group boycott and rule-of-reason restraint of trade; and paragraphs 339 through 357 concerning monopolization and attempted monopolization.

408. SafeSport and USA Water Polo knowingly combined, conspired, agreed, or acted in concert through the SafeSport Code, USA Water Polo membership rules, eligibility requirements, club requirements, incorporated procedures, disciplinary-recognition mechanisms, database entries, communications, and automatic-enforcement practices to control access to the relevant market or submarket.

409. The relevant market, or alternatively relevant submarket, is the market for paid USA Water Polo-affiliated water polo coaching, club instruction, private water polo

instruction, aquatics instruction connected to USA Water Polo-affiliated club participation, and athlete-development services for athletes, parents, students, clubs, and teams that require or rely upon USA Water Polo eligibility, SafeSport clearance, SafeSport training, background screening, good-standing status, or national-governing-body recognition.

410. SafeSport and USA Water Polo shared a common purpose to maintain centralized control over who may participate, coach, instruct, provide private lessons, work with athletes, affiliate with clubs, and access paid athlete-development opportunities within the USA Water Polo-affiliated ecosystem.

411. The conspiracy operated through a coordinated enforcement structure. SafeSport created, maintained, transmitted, published, or caused recognition of restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and records. USA Water Polo recognized, transmitted, enforced, relied upon, or gave practical effect to those restrictions, sanctions, labels, database entries, eligibility consequences, and records within the national-governing-body system.

412. The conspiracy had the specific intent to maintain or obtain monopoly power in the relevant market or submarket by ensuring that access to paid USA Water Polo-affiliated coaching, instruction, private-lesson, club, and athlete-development opportunities depended on SafeSport clearance, SafeSport labels, USA Water Polo eligibility, good-standing status, and automatic recognition of SafeSport disciplinary consequences.

413. Defendants' specific intent is shown by their continued recognition, enforcement, transmission, publication, and gatekeeping use of SafeSport restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, and records even after material contradictions surfaced, even after the criminal cases were dismissed, and even after the Supplemental Order found intentional withholding of exculpatory evidence, bad faith, malice, interference with the investigation, and fraud upon the court.

414. Defendants committed overt acts in furtherance of the conspiracy, including creating or maintaining SafeSport records and labels concerning K.M.; transmitting or causing recognition of those labels and consequences; causing USA Water Polo-affiliated programs to treat K.M. as ineligible, restricted, suspended, or unavailable; causing or permitting Seminole Aquatics to remove K.M. from paid swim-instruction work; causing or contributing to Patriot Aquatics removing K.M. from coaching; allowing another market participant to receive the paid work K.M. lost; and continuing to maintain or give effect to the challenged records and labels after material contradictions surfaced.

415. Defendants also committed overt acts by using or permitting the use of public-facing disciplinary labels, database entries, eligibility consequences, institutional communications, and SafeSport-related records in a manner that restricted K.M.'s market access and impaired her ability to compete for paid instruction, coaching, private-lesson, and athlete-development opportunities.

416. The conspiracy harmed competition in the relevant market or submarket by excluding K.M. as a competing provider of paid instruction, coaching, private lessons, and athlete-development services; reducing available provider choice; depriving parents,

students, athletes, and clients of their preferred instructor or coach; shifting K.M.'s paid work to another market participant; and maintaining a gatekeeping system in which access to paid opportunities depends on automatic recognition or enforcement of SafeSport labels regardless of whether the underlying process was materially incomplete, unreliable, contradicted, or tainted.

417. The conspiracy did not merely injure K.M. personally. It operated through a broader exclusionary mechanism capable of excluding coaches, instructors, athletes, and participants from paid opportunities within the USA Water Polo-affiliated ecosystem without independent market-facing review by USA Water Polo and without adequate safeguards against false, incomplete, tainted, unreliable, or misleading disciplinary labels.

418. Defendants' conduct was not competition on the merits. It was exclusionary conduct that used SafeSport's disciplinary machinery and USA Water Polo's national-governing-body gatekeeping authority to foreclose K.M. from market participation based on records, labels, sanctions, restrictions, database entries, and eligibility consequences derived from a defective process.

419. Defendants' conduct was broader than necessary to serve any legitimate athlete-safety purpose. Less restrictive alternatives were available, including prompt neutral review, temporary confidential restrictions, tailored no-contact conditions, supervised participation, nonpublic interim status, independent USA Water Polo review before club-level enforcement, correction or removal of tainted records after material

contradictions surfaced, and refusal to give continuing effect to disciplinary labels derived from incomplete or unreliable information.

420. Defendants had no legitimate procompetitive justification sufficient to outweigh the exclusionary and anticompetitive effects of the conspiracy. Defendants could protect athlete safety without using materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, or participation consequences to exclude K.M. and similarly situated persons from paid coaching, instruction, private-lesson, club, and athlete-development opportunities.

421. K.M. suffered antitrust injury because her business and property injuries flowed from the competition-reducing aspect of Defendants' conspiracy. K.M. lost paid swim-instruction work, private-lesson opportunities, water polo coaching opportunities, and other economic opportunities because Defendants' coordinated gatekeeping structure foreclosed her from market participation, shifted work to another market participant, deprived consumers of their preferred instructor, and reduced competition and consumer choice in the relevant market or submarket.

422. K.M.'s injuries were direct and foreseeable. Defendants knew or should have known that a SafeSport suspension, disciplinary label, ineligibility designation, or USA Water Polo-recognized eligibility consequence would remove K.M. from paid coaching, instruction, club, private-lesson, and athlete-development opportunities because USA Water Polo-affiliated clubs, coaches, instructors, athletes, parents, and

programs rely on SafeSport and USA Water Polo eligibility status when deciding who may participate, coach, instruct, or provide services.

423. Defendants' conduct violated Sherman Act § 2 by conspiring to monopolize the relevant market or submarket through a coordinated structure that used SafeSport disciplinary labels and USA Water Polo eligibility consequences to control access to paid USA Water Polo-affiliated coaching, instruction, private-lesson, club, and athlete-development opportunities.

424. K.M. seeks treble damages, costs, and attorneys' fees under 15 U.S.C. § 15 for injuries to her business or property caused by Defendants' conspiracy to monopolize in violation of Sherman Act § 2. K.M. also seeks injunctive relief under 15 U.S.C. § 26 requiring Defendants to cease coordinated recognition, enforcement, transmission, publication, or gatekeeping use of materially false, incomplete, tainted, or unreliable restrictions, disciplinary labels, database entries, records, sanctions, eligibility consequences, or participation consequences concerning K.M.

**CONDITIONS PRECEDENT**

425. All conditions precedent to filing this action have occurred, have been performed, have been waived, or have been excused.

426. Plaintiff seeks an award of attorneys' fees only to the extent authorized by applicable statute, contract, rule, the SafeSport Code, USA Water Polo membership or participation agreements, any applicable fee-shifting provision, or any other basis recognized by law.

427. Plaintiff expressly preserves her right to seek attorneys' fees if discovery establishes a contractual, statutory, rule-based, equitable, or bad-faith basis for such an award.

428. Plaintiff seeks punitive damages against SafeSport, Tripp, and any other Defendant against whom punitive damages are legally available based on the following conduct:

(a) SafeSport and Tripp's intentional misconduct, as defined in Fla. Stat. § 768.72(2)(a), in that they had actual knowledge of the wrongfulness of their conduct, including converting K.M. from a claimant into a criminal suspect without interviewing her, falsely reporting to law enforcement that E.C. had reported the matter to SafeSport, directing a witness to file criminal charges after K.M. had provided exculpatory evidence, and intentionally withholding exculpatory evidence from criminal proceedings, and the high probability that injury to K.M. would result, and despite that knowledge, intentionally pursued that course of conduct, resulting in severe injury to K.M.;

(b) SafeSport and Tripp's gross negligence, as defined in Fla. Stat. § 768.72(2)(b), in that their conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of K.M., including the right to due process, the right to be free from false criminal accusations, and the right to pursue her chosen profession and athletic career without tainted disciplinary labels;

(c) Plaintiff has satisfied the pleading requirements for punitive damages under Federal Rules of Civil Procedure 8(a)(3) and 9(g), which permit a prayer for punitive damages to be included in the initial complaint. *See Cohen v. Office Depot, Inc.*,

184 F.3d 1292, 1298-99 (11th Cir. 1999), *vacated on other grounds*, 204 F.3d 1069 (11th Cir. 2000) (recognizing that § 768.72 conflicts with Rule 8(a)(3)). The detailed factual allegations in this Complaint, together with the Seminole County Court's findings that SafeSport "*perpetrated a fraud upon the Court*" and "*acted in bad faith, intentionally, and with malice*," provide a reasonable evidentiary basis for punitive damages, in that SafeSport's officers, directors, or managers knowingly condoned, ratified, or consented to the intentional misconduct and gross negligence of Tripp and other SafeSport personnel, including by refusing to comply with court orders, refusing to respond to law enforcement requests, and continuing to enforce sanctions after the criminal court found SafeSport had intentionally withheld exculpatory evidence and acted in bad faith and with malice;

(d) The Supplemental Order's findings that SafeSport "*perpetrated a fraud upon the Court, the People of the State of Florida, the Sheriff's Office, the State's Attorney Office, and defendant*," "*intentionally withheld exculpatory evidence*," and "*acted in bad faith, intentionally, and with malice*" provide a reasonable evidentiary basis for punitive damages under the standard announced in *Perlmutter v. Federal Insurance Co.*, No. SC2024-0058, 2026 WL 1689765 (Fla. June 11, 2026). Under *Perlmutter*, at the pleading stage, a trial court must determine whether a reasonable person could conclude, based on the claimant's evidence, that the defendant committed intentional misconduct or gross negligence as defined in section 768.72(2). The Supplemental Order's findings, together with the detailed factual allegations in this Complaint, satisfy that standard;

(e) The criminal court in the expungement proceedings found that the conduct of SafeSport and its investigator was "*clear, convincing, and beyond doubt*," which demonstrates that K.M. has a reasonable evidentiary basis to recover punitive damages under section 768.72(1). The *Perlmutter* Court clarified that the clear-and-convincing-evidence standard applies at trial, not at the pleading stage. The relevant inquiry at this stage is whether K.M.'s evidence supplies a reasonable evidentiary basis from which a reasonable person could conclude that Defendants engaged in intentional misconduct or gross negligence. The criminal court's findings and the facts alleged herein provide that reasonable basis; and

(f) Plaintiff further notes that in federal court, under Rules 8(a) and 9(g) of the Federal Rules of Civil Procedure, "*malice, intent, knowledge, and other conditions of a person's mind may be alleged generally*," and special damages such as punitive damages need only be specifically stated. To the extent this Court determines that Florida's pleading requirements for punitive damages apply, Plaintiff has satisfied the standard articulated in *Perlmutter* because the evidence proffered in this Complaint and the findings of the Seminole County Court provide a reasonable evidentiary basis for recovery of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff K.M. respectfully requests that judgment be entered in her favor and against Defendants, jointly and severally where permitted by law, and that the Court award the following relief:

A. Compensatory damages, including reputational damages, emotional-distress damages, economic damages, antitrust damages, and all other damages recoverable under the causes of action alleged herein, in an amount to be determined by the jury;

B. Special damages, including legal expenses, investigative expenses, costs incurred defending the criminal and SafeSport proceedings, lost athletic and educational opportunities, lost coaching and instructional opportunities, lost private swim-lesson opportunities, lost or impaired access to recognized athlete-development pathways, costs and burdens associated with monitoring, explaining, correcting, challenging, or mitigating public-record and background-search consequences, lost economic opportunities, pecuniary losses caused by false or materially misleading statements and labels, business or property losses caused by anticompetitive conduct, and other economic losses proved at trial;

C. Treble damages, costs, and attorneys' fees under 15 U.S.C. § 15 for injuries to K.M.'s business or property caused by Defendants' violations of Sherman Act § 1 and Sherman Act § 2, including Defendants' group boycott, rule-of-reason restraint of trade, monopolization, attempted monopolization, and conspiracy to monopolize;

D. Injunctive relief under 15 U.S.C. § 26 requiring Defendants to cease any unlawful group boycott, unreasonable restraint of trade, monopolization, attempted monopolization, conspiracy to monopolize, automatic recognition, enforcement, transmission, publication, or gatekeeping use of materially false, incomplete, tainted,

unreliable, or misleading restrictions, disciplinary labels, database entries, records, sanctions, eligibility consequences, or participation consequences concerning K.M.;

E. Declaratory relief under 28 U.S.C. § 2201 declaring the parties' rights and obligations under the SafeSport Code, USA Water Polo's membership and participation rules, incorporated procedures, written agreements, third-party-beneficiary obligations, membership-based obligations, equitable duties, antitrust law, federal due process principles, ultra vires principles, unconstitutional-delegation principles, and the facts alleged herein;

F. Declaratory relief under 28 U.S.C. § 2201 declaring that Defendants may not continue to publish, transmit, maintain, recognize, enforce, rely upon, or give gatekeeping effect to materially false, incomplete, tainted, unreliable, or misleading allegations, restrictions, sanctions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, background-search consequences, or participation consequences concerning K.M.;

G. Declaratory relief under 28 U.S.C. § 2201 declaring that, as applied to K.M., Defendants exceeded their lawful authority by creating, maintaining, recognizing, enforcing, publishing, transmitting, or giving gatekeeping effect to materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences concerning K.M.;

H. Declaratory relief under 28 U.S.C. § 2201 declaring that, as applied to K.M., Defendants violated federal procedural due process by depriving her of protected liberty

and property interests without fair notice, a meaningful opportunity to be heard, meaningful access to exculpatory and impeachment information, neutral and reliable decisionmaking, adequate safeguards against false or tainted allegations, and a meaningful mechanism to correct or limit continuing reliance on defective records and labels;

I. Declaratory relief under 28 U.S.C. § 2201 declaring that, as applied to K.M., Defendants' creation, maintenance, recognition, enforcement, publication, transmission, or gatekeeping use of materially false, incomplete, tainted, unreliable, or misleading allegations, records, sanctions, restrictions, disciplinary labels, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences resulted from an unconstitutional delegation of governmental power to private entities without constitutionally adequate supervision, accountability, and safeguards;

J. Further necessary or proper relief under 28 U.S.C. § 2202, including correction, removal, retraction, restricted dissemination, nonuse, nonrecognition, nonenforcement, notice to affected entities, and any other equitable relief necessary to prevent continuing reliance on materially false, incomplete, tainted, unreliable, or misleading allegations, records, labels, restrictions, sanctions, database entries, eligibility consequences, institutional communications, public-facing records, or participation consequences concerning K.M.;

K. Injunctive and equitable relief requiring Defendants, where applicable, to correct, remove, restrict, retract, cease reliance upon, cease recognition of, cease

enforcement of, cease publication of, or restrict dissemination of records, sanctions, probationary conditions, no-contact restrictions, training requirements, eligibility determinations, database entries, public-facing disciplinary records, law-enforcement-related records, national-governing-body communications, USA Water Polo communications or enforcement records, and related communications derived from the defective process alleged herein;

L. Injunctive and equitable relief requiring Defendants, where applicable, to provide notice to affected entities, including USA Water Polo-affiliated clubs, programs, coaches, instructors, administrators, parents, athletes, background-search or data-aggregation recipients known to Defendants, and other persons or entities to whom Defendants transmitted, published, recognized, enforced, or gave effect to challenged records, sanctions, restrictions, labels, eligibility consequences, or institutional communications concerning K.M.;

M. Injunctive relief requiring Defendants, where applicable, to cease any coordinated recognition, enforcement, transmission, publication, or gatekeeping use of materially false, incomplete, tainted, or unreliable restrictions, disciplinary labels, database entries, records, sanctions, eligibility consequences, or participation consequences concerning K.M. that operate as an unlawful group boycott, unreasonable restraint of trade, monopolization, attempted monopolization, or conspiracy to monopolize;

N. Punitive damages against SafeSport, Tripp, and any other Defendant against whom punitive damages are legally available, in an amount to be determined by the jury;

429. Prejudgment and post-judgment interest as permitted by law;

O. Costs and attorneys' fees to the extent authorized by statute, contract, rule, the SafeSport Code, USA Water Polo membership or participation agreements, the Sherman Act, any applicable fee-shifting provision, bad faith, or any other basis recognized by law;

P. Trial by jury on all issues so triable; and

Q. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 6, 2026

Respectfully submitted,
/SS/ Russell Scott Prince

Russell Scott Prince, Esq.
Prince Sports Law
100 S. Ashley Dr., Suite 600
Tampa, FL 33602
(813) 765-0550
Florida Bar No. 109554
russ@princesportslaw.com
www.princesportslaw.com
*Counsel for Plaintiff K.M.*